ATTORNEY GENERAL, *ex rel.* COMMISSIONER OF
INSURANCE, *v.* MICHIGAN SURETY COMPANY.

1. INSURANCE—PUBLIC INTEREST.

   The insurance business is affected with a public interest.

2. SAME—CONSTRUCTION OF STATUTES—REGULATION OF BUSINESS.

   Insurance laws are liberally construed so as to favor the interests
   of the public, the policyholders, and creditors, and to that end
   the courts are bound to give full effect to legislative efforts
   to regulate the business of insurance as it is carried on in
   this State.

3. SAME—STATUTES—PROPERTY—VALUE—INSOLVENCY.

   The value of property acquired by an insurance company in
   violation of statutory proscriptions must be excluded in a pro-
   ceeding to determine its solvency.

4. SAME—DE NOVO REVIEW—INSOLVENCY OF COMPANY.

   The Supreme Court reviews *de novo* determinations made in suit
   by commissioner of insurance to determine solvency of an in-
   surance company.

5. SAME—REAL PROPERTY—STATUTES—INSOLVENCY.

   Determinations of commissioner of insurance that real estate ap-
   praised at $505,000 should be excluded from consideration
   in determining solvency of domestic insurance company is
   approved, where record presented shows such real estate had

---

REFERENCES FOR PAINTS IN HEADNOTES
[1]   29 Am Jur, Insurance § 49.
[2]   50 Am Jur, Statutes §§ 386, 387.
[3, 5, 6, 10]   29 Am Jur, Insurance § 116.
[4]   42 Am Jur, Public Administrative Law § 206 *et seq.*
[7]   13 Am Jur, Corporations § 1000.
   Validity of contract between corporations as affected by directors
   or officers in common.   33 ALR2d 1060.
[9]   20 Am Jur, Evidence § 1212.
[11]   29 Am Jur, Insurance § 48 *et seq.*
[12]   29 Am Jur, Insurance § 118.
[13]   14 Am Jur, Costs § 37.

been acquired in violation of statutory proscription (CLS 1956,. § 500.948).

6. SAME—INSOLVENCY—PAYMENT OF DEBT—FINDING OF COMMISSIONER.

Finding of commissioner of insurance that a $405,000 debt of defendant insurance company had not been effectively canceled or otherwise paid *held*, proper, under record presented in suit to determine solvency of the company.

7. SAME—PUBLIC INTEREST—DEALINGS WITH DIRECTORS—COMMON. DIRECTORATES.

The careful scrutiny accorded transactions between domestic corporations and their directors or other corporations having common directors, accorded by the general corporation law, is equally applicable to insurance companies, the latter also being affected with a public interest (CLS 1956, § 450.13).

8. SAME—OWNERSHIP OF REAL ESTATE.

The legislative relaxation of the ban upon acquisition of non-liquid real-estate assets by insurance companies to permit them to accept real estate as a liquid asset in satisfaction of debts owing does not extend to the acquisition of real estate by a subsidiary insurance company from parent company having common directors with those of the acquirer whose solvency is questioned by the commissioner of insurance, in the absence of showing that parent's debt to its insurance company subsidiary could not otherwise be paid (CLS 1956, § 500.948).

9. EVIDENCE—JOURNAL ENTRIES—INSURANCE COMPANY—SOLVENCY.

Journal entries of subsidiary insurance company whose solvency is questioned by commissioner of insurance *held*, inadequate, alone, to support claim that obligation to parent insurance company had been canceled.

10. INSURANCE—INSOLVENCY—EVIDENCE.

Trial judge's finding of solvency of defendant domestic insurance company is reversed, where item of $505,000, as value of real estate, is found to have been not properly allowable as an asset, and attempted reduction of liabilities by $405,-000 is found to have been improper (CLS 1956, § 500.948).

11. SAME—CONSTRUCTION OF STATUTES—COURTS.

The insurance code is designed to assure the people that their insurance companies shall be, and remain, solvent and liquid and that when judicial control is exercised over their affairs it shall be exercised effectively (CL 1948, §§ 550.103, 550.104; CLS 1956, §§ 500.900–500.960, 500.7800 *et seq.*, as amended).

12. SAME—CUSTODIAN—REHABILITATION—RECEIVERS.

Decree returning insurance company to its board of directors is reversed and the company subjected to judicial control through court-appointed custodian to permit the company's rehabilitation through disposition of nonliquid assets and effective reduction of intercorporate liabilities, a receiver to liquidate not being currently necessary.

13. COSTS—INSURANCE COMPANY—COURTS—CUSTODIAN—RECEIVERS.

No costs are allowed in proceedings by commissioner of insurance to obtain custody of domestic insurance company and for appointment of receiver, where custody of the company is ordered but receivership presently is not required (CLS 1956, § 500.7800 *et seq.*).

CARR, KELLY, and BLACK, JJ., dissenting.

Appeal from Ingham; Coash (Louis E.), J. Submitted January 4, 1961. (Docket No. 36, Calendar No. 48,739.) Decided September 23, 1961.

Bill by Paul L. Adams, Attorney General, on the relation of Frank Blackford, Commissioner of Insurance, against Michigan Surety Company, a Michigan insurance corporation, to place company in receivership. Interim order entered placing affairs of company in hands of commissioner as custodian. Following interim operation, adjustment in respect to certain assets, and audit, plaintiff petitioned for liquidation. Defendant petitioned for discharge of custodian and return of assets, with later reliance on certain changes in capital structure and in management. Insurance Corporation of America, an Indiana corporation, holding company, intervened as party defendant. J. Edwin Larson, Insurance Commissioner of State of Florida, and Alden C. Palmer, Commissioner of Insurance of State of Indiana, intervened as parties defendant. Decree for defendant determining solvency of company, terminating custodial care, returning assets and operation of company to its board of directors, and

dismissing bill. Plaintiff appeals. Reversed and remanded for custody.

*Paul L. Adams*, Attorney General, *Samuel J. Torina*, Solicitor General, *Maurice M. Moule* and *Burton P. Daugherty, Jr.*, Assistant Attorneys General, for plaintiff.

*Clayton F. Jennings*, *Roscoe O. Bonisteel*, and *James P. Stewart*, for defendant.

*Richard B. Foster* (*Edmund E. Shepherd*, of counsel) and *Foster, Foster, Campbell & Lindemer*, for intervenor Insurance Corporation of America.

*Amicus Curiae:*

*Mark McElroy*, Attorney General of Ohio, *Gerald J. Celebrezze* and *William P. Meehan*, Assistant Attorneys General of Ohio.

KELLY, J. (*dissenting*). This is an action brought by the Michigan insurance commissioner to place defendant, Michigan Surety Company, in receivership for liquidation on the grounds that defendant is statutorily insolvent. At the conclusion of extended hearings, the Hon. Louis E. Coash, circuit judge of Ingham county, granted the petition of the company, and in the decree filed April 18, 1960, found that the company was solvent; that its conditions were not such that its transaction of business would be hazardous to policyholders, creditors, or the public; that the commissioner had failed to prove by competent evidence that the company was insolvent; and, therefore, ordered that the bill of complaint be dismissed.

The commissioner and the attorney general appeal, contending:

1. That the intercorporate relationship between the company and the 2 Kroll-controlled agency service organizations was hazardous to the company's policyholders, its creditors, and the public;

2. That the determination of the commissioner that the company was insolvent could not be reversed by the court because said determination was reasonable and lawful; and

3. That the determination of the commissioner that the company was insolvent was reasonable and in accordance with the statute.

The commissioner's action from its inception was based on the provisions of the Michigan insurance code of 1956 (PA 1956, No 218), chapter 78 (CLS 1956, § 500.7800 *et seq.* [Stat Ann 1957 Rev § 24.17800 *et seq.*]), which provides that the commissioner may relate to the attorney general facts which would justify receivership and liquidation of an insurer, and the attorney general may institute proceedings in chancery in the circuit court for the county of Ingham; further, under the provisions of section 7814 of said chapter 78, after hearing on an order to show cause, the court can order the liquidation of the business of such corporation under the direction of the commissioner as statutory receiver, and the receiver shall be vested by operation of law with title to all of the property, contracts, and rights of action.

The officers and directors of defendant company complied with the commissioner's request for a special board of directors meeting and met with him in the city of Detroit on October 28, 1959. At this meeting, the commissioner read from a previously prepared statement and advised the officers and directors as follows:

"Michigan Surety Company is hopelessly insolvent. Its capital and surplus have been completely exhausted. * * *

"This meeting has been called to extend to you the courtesy of being advised as to our conclusions and course of action. Arrangements have been made to institute immediate receivership proceedings. We are willing to offer to you, as the company's board of directors, the alternative of voluntarily initiating those proceedings yourselves. This action would have to be instituted immediately."

The meeting continued on into the second day (October 29th), and the commissioner informed the directors they would have to raise $1,800,000, which sum was later reduced by the commissioner to $1,-500,000. $1,000,000 was offered, but this offer was refused.

The bill of complaint which had been signed and verified on the 26th day of October, 1959, was filed on October 30, 1959.

November 4, 1959, defendant company filed its answer to the court's order to show cause, alleging that in its 45 years of existence it had never "failed to pay a claim properly arising under its bond or insurance policies"; also, that the commissioner had failed to follow the procedure set forth in section 222 of the insurance code of 1956 (CLS 1956, § 500.-222 [Stat Ann 1957 Rev § 24.1222]), and did not grant a hearing before filing his report. Defendant's answer further stated (paragraph 12):

"At a joint meeting of the board of directors on October 27, 1959, the directors of the Michigan Surety Company offered to increase the capital, if necessary, to the extent of $1,000,000, part to be paid in in 10 days and the remainder in 30 days. Because of the criticism as to management outside the State of Michigan, Mark Kroll agreed to resign as president and director, and also directors W. A. Helmke, Jules T. Gradison, and J. A. Watkins. The commissioner expressed the thought that Nelson Lancione of Columbus, Ohio, should remain a member

of the board. He also indicated that the Michigan directors, G. W. Draper, C. F. Jennings, C. M. Jones, H. P. Lyman, Fred Marin, R. O. Bonisteel, and R. E. Reichert continue on the board, a ninth to be selected when the plan was consummated, agreeing that the insurance commissioner could approve of the director selected. This plan was rejected by the commissioner."

November 5, 1959, pursuant to a stipulation entered into between counsel for the parties, the court

"ordered, adjudged and decreed as follows:

"1. That an operating committee of 3, composed of Frank Blackford, G. W. Draper, and Rudolph E. Reichert, shall be and is hereby appointed to conduct the operations of the company for a period of 45 days or until further order of this court, and that the committee is hereby given discretionary powers to operate the business in its normal manner.

"2. That the firm of Joseph Froggatt & Company of New York City be employed by the company as an independent auditing firm to audit the books of the Michigan Surety Company, Surety Underwriters, Inc., Wilmark Agency, and Agency Corporation of America, all audits to be as of October 31, 1959."

January 8, 1960, the court entered the following order:

"In this cause the bill of complaint for the appointment of a receiver having been filed by Paul L. Adams, attorney general of the State of Michigan, on the relation of Frank Blackford, commissioner of insurance of the State of Michigan, and an order to show cause having been issued thereon directed to the respondent to show cause why the said respondent Michigan Surety Company should not be placed in receivership or such other relief granted as should appear to be just and proper to the court; and an answer having been filed by the respondent company denying the allegations thereof; and the

same having been set for hearing before said court; and having read the report of Joseph Froggatt & Company made an exhibit in open court disclosing that the said respondent is in such condition that its further transaction of business would be hazardous to its policyholders, its creditors and the public; and it further appearing that the said respondent company is insolvent in that said company is in such condition it could not meet the requirements for the incorporation and authorization under the insurance code of the State of Michigan; and said report also disclosing that the respondent company has nonadmitted assets with commercial value, and upon due consideration thereof and the court having been fully advised in the premises, on motion of Maurice M. Moule, assistant attorney general,

"It is ordered that Frank Blackford, commissioner of insurance of the State of Michigan, be and is hereby appointed custodian of said respondent and is directed and authorized to take possession of its property, assets and the conduct of its business."

On February 25, 1960, the commissioner filed a petition to liquidate stating that the 45-day period "during which efforts were to be made to determine whether company could be sold, rehabilitated through the infusion of adequate new capital, or its entire portfolio reinsured" had expired; that "the financial condition of the company has steadily worsened," and

"Petitioner prays that the title of the present custodian be changed to receiver and that he be authorized to proceed to liquidate the assets of the said respondent Michigan Surety Company and wind up its affairs."

March 24, 1960, the company filed a petition to discharge the custodian, setting forth facts the company claimed justified the following statements:

"Since the rendering of such audit report by Joseph M. Froggatt & Company the financial condi-

tion of the company has materially and substantially improved, and petitioner, upon information and belief, is in position to present to the court a plan whereby the operation of the company can be so conducted as to permit and require the discharge of the custodian and the restoration of the assets and the conduct of the business to the board of directors of the company.

"The assets of the company as shown by the Joseph Froggatt & Company report were $3,886,064.60. Pursuant to section 948 of the Michigan insurance code, being CLS 1956, § 500.948 (Stat Ann 1957 Rev § 24.1948), and strictly in compliance thereof, the company acquired real estate in Chicago at a book value of $8,000, real estate in Tampa, Florida, at a book value of $192,056.68, and real estate in Brevard county, Florida, at a book value of $278,000. Also under the above section of the insurance code it acquired real estate in Lansing at a book value of $47,500. The appraised value of the aforesaid real estate is considerably in excess of the book value. The foregoing real estate should be an admitted asset, which would increase the assets in the amount of $575,586.68. Miscellaneous items of assets acquired is $8,995.28. The overdue balances of $129,709.56 has been reduced, increasing the surplus of the company in the amount of $70,000. In the aggregate the assets have been increased in the amount of $654,581.96. There has been deducted from the assets the reduction of free cash as of March 14, 1960, in the amount of $158,707.28, and the agency balance in the amount of $203,538.10, making in the aggregate a reduction of the assets of $362,245.38. The balance of assets is thereby $4,178,401.18. * * *

"Wherefore, the company now being solvent and being able to meet the requirements for the incorporation and authorization under the insurance code of the State of Michigan, petitioner prays that after a hearing upon this petition an order may be entered requiring the custodian to render an accounting of his custodianship and upon the acceptance and ap-

proval thereof, the court also enter an order discharging the custodian and returning the assets and property of the company and the conduct of its business to its board of directors."

March 29, 1960, the court ordered that the auditors (Froggatt & Company) bring the balance sheets of its audit forward from October 31, 1959, to include all figures through December 31, 1959, and compare its figures with the company's annual statement for the year 1959.

The court's decree filed April 18, 1960, provided:

"1. The court finds and adjudges that Frank Blackford, commissioner of insurance of the State of Michigan, and custodian herein, on whose relation the attorney general filed his bill of complaint in this matter, has failed to establish by competent evidence any of the grounds asserted therein or enumerated in section 7802 of the insurance code of 1956,* or alleged in his petition, for liquidation of the assets of the defendant Michigan Surety Company and the winding up of its affairs.

"2. Following procedure mapped by section 7810 of the insurance code of 1956,† the court finds and adjudges that any ground for its order of January 8, 1960, appointing the commissioner of insurance of this State as such custodian and directing him to take possession of the assets and property of the defendant aforesaid, has been removed, and that defendant Michigan Surety Company can properly resume possession of its property and assets and the conduct of its business.

"3. The court finds and adjudges that, defendant Michigan Surety Company is solvent, and that it is therefore in such condition that its transaction of business will not be hazardous to its policyholders, its creditors, or the public, and that it can meet the

* CLS 1956, § 500.7802 (Stat Ann 1957 Rev § 24.17802).—REPORTER.
† CLS 1956, § 500.7810 (Stat Ann 1957 Rev § 24.17810).—REPORTER.

requirements for incorporation and authorization.

"4. The court further finds and adjudges that Frank Blackford, insurance commissioner of the State of Michigan, has failed to prove by any competent evidence whatsoever that defendant Michigan Surety Company is in such condition that further transaction of its business will be hazardous to its policyholders, or its creditors, or the public, by reason of its relationship with Insurance Corporation of America or any other corporate entity.

"5. It is therefore ordered, adjudged, and decreed that plaintiff's bill of complaint, and the pending petition of the custodian to liquidate the assets of the Michigan Surety Company, defendant, be and the same are hereby dismissed with full prejudice, and the relief therein prayed is in every respect denied."

Almost immediately after the entry of the decree, namely, on April 19, 1960, the attorney general filed both a claim of appeal and a petition for stay of proceedings, stating:

"1. That a motion for a stay of proceedings, pursuant to Rule No 62 of the Michigan Court Rules (1945), was made to the Honorable Louis E. Coash, circuit judge of Ingham county circuit court, who heard this matter, but the said circuit judge refused to grant a stay of proceedings for more than 7 days.

"2. The commissioner of insurance, Frank Blackford, as custodian of the above named respondent, has attempted to preserve the assets of the said respondent during the period of custodianship and has made no disbursements except upon order of the circuit court for the county of Ingham.

"3. That there is a serious legal and accounting question presented by this matter with respect to the admissibility of certain assets claimed to be admissible by the said respondent, but which this petitioner claims are not admissible under the statutory provisions of insurance accounting; one of

these items being Florida real estate in the amount of over $500,000.

"4. That the auditor appointed by the circuit court for the county of Ingham to determine whether the said respondent is in such financial condition that it could not meet the requirements of the statute, which would make the continuation of its operation hazardous to the public, has found that there is such a condition.

"5. That to permit the company to be returned to its own management would be to further impair the rights of its policyholders, creditors and the public."

April 25, 1960, the State of Indiana filed its "Memorandum of intervenor in opposition to petition for stay of proceedings" and as a basis of intervention stated to this Court as follows: That on April 11, 1960, the petition of the State of Indiana to intervene was granted by Judge Coash and from then to the conclusion of the taking of evidence and the rendering of the opinion and entry of decree, Indiana was represented in the Ingham circuit court; that Indiana intervened because the issue concerns a group of Indiana citizens who are policyholders in the defendant company and that "the interests of these persons are at stake in this proceeding"; that at the conclusion of final arguments at the trial before Judge Coash, the State of Florida (another intervenor) "recommended that judgment be entered to effectuate the return of assets, management and control of Michigan Surety Company to its stockholders and directors," and that this request on behalf of the State of Florida was joined by the request of Indiana; that after such action by Indiana and Florida, the State of Ohio moved its appearance as *amicus curiae* and supported the petition for appointment of a receiver; further, that

"It is the position of the State of Indiana that Michigan Surety Company is not in fact insolvent,

and that the position of its creditors, stockholders, and policyholders, are not in fact jeopardized. That the company is solvent in fact, is not denied in any of the auditor's reports, and was admitted upon cross examination of petitioner's expert witnesses."

On April 27, 1960, this Court issued an order of remand stating that pursuant to stipulation of counsel of the parties the petition for a stay should be held in abeyance pending further order of this Court and that proceedings would be remanded to the circuit court of Ingham county "with authority to entertain and determine motions and to issue directives and orders deemed necessary and appropriate with reference to the financial transactions and the orderly conduct of the business of defendant corpoation, such orders and directives to be subject to review by this Court."

The Ingham circuit court then issued its order (April 27, 1960) that:

"The company shall not dispose of any assets except in the usual and ordinary course of its business affairs without the approval of this court.

"The company shall furnish to the department of insurance a monthly balance sheet statement and the department may at its discretion send to the company office during the business hours an agent or examiner for the purpose of verification of such monthly statement at the expense of the company, but not to exceed 2 business days per month."

Certified copy of the resolution of stockholders of defendant company, adopted July 7, 1960, reducing par value of stock, was filed with the court, said resolution providing that:

"Article 8 of the articles of association be amended to increase the capital stock to $1,001,000 and to reduce the par value of the stock from $25 a share to $17.50 a share. The motion carried by vote of stockholders present representing 243 shares, stockholders

represented by proxy committee 25,061 shares. Management was directed to process amendment with the insurance department."

The resolution of the board of directors of defendant company adopted October 27, 1960, was also filed with the Ingham circuit court. This resolution provided:

"Now therefore it is hereby resolved and agreed that the company shall not hereafter enter into any management contracts with respect to the operation of its business with Agency Corporation of America, Surety Underwriters, Inc., or any other company in which Mark Kroll has an interest, and that Insurance Corporation of America or any other firm or corporation in which Mark Kroll has an interest will not adjust losses for and on behalf of the company, and that Mark Kroll will not become or serve as an officer or director of the company, provided, that the company may enter into standard agency agreements with Agency Corporation of America, Surety Underwriters, Inc., or any other firm or corporation in which Mark Kroll has an interest if first approved by the commissioner of insurance for the State of Michigan."

On the 23d day of December, 1960, Judge Louis E. Coash entered an order approving the above-mentioned resolutions.

In this appeal the commissioner asks this Court to agree with his contention that the intercorporate relationship existing between defendant company and the 2 Kroll-controlled agency service organizations creates a hazardous threat to the welfare of the policyholders, creditors, and the public, justifying this Court ordering liquidation.

To dispose of this contention we consider also 2 more of the commissioner's conclusions: (1) That this Court should not give consideration to "anything having to do with company's financial structure *after*

December 31, 1959"; and (2) that the "insurance commissioner, not court, determines insolvency."

In regard to the 2 Kroll companies, we conclude:

1. The commissioner was justified in his objections to the intercorporate relationship existing between the defendant and the 2 Kroll-controlled agency service organizations when he requested the attorney general to institute the present proceedings;

2. The improper Kroll relationship has been definitely brought to an end by the resolution of October 27, 1959, of the board of directors, accepted and honored by the circuit court of Ingham county.

Nothing in this opinion prevents or restricts the commissioner from future action in making certain that such a commitment is faithfully lived up to and any deviation from such commitment should be instantly met by action by the commissioner, the Ingham circuit court, and this Court, upon request of the commissioner showing that the resolution and commitment "that the company shall not hereafter enter into any management contracts with respect to the operation of its business with Agency Corporation of America, Surety Underwriters, Inc., or any other company in which Mark Kroll has an interest," has been violated.

Should this Court pass final judgment in regard to liquidation and receivership on conditions and facts as they exist at the time of our final decision, or on the facts and conditions as they existed at the time the attorney general commenced action in the circuit court of Ingham county? Who decides the question of insolvency? The trial court and the Supreme Court, or are both courts bound by the decision of the commissioner?

This proceeding is instituted under chapter 78 of the insurance code of 1956, and section 7810 (CLS 1956, § 500.7810 [Stat Ann 1957 Rev § 24.17810]) provides that the court may "after a full hearing" restore

to defendant "possession of its property and the conduct of its business." We conclude from this provision that the legislature so provided realizing that the grounds for issuance of the initial order to show cause might be removed and that the decision of insolvency should be made on facts existing at the conclusion of the hearing rather than at the start of proceedings.

Section 244 of the code (CLS 1956, § 500.244 [Stat Ann 1957 Rev § 24.1244]) provides for judicial review of "any final order or decision made, issued, or executed by the commissioner," said judicial review to be in the circuit court "as a civil case in chancery" upon the transcript and "such additional evidence as may be offered by any of the parties at the hearing of said cause before the court," with right of appeal from the circuit court to this Court.

In an effort to sustain the commissioner's contention that the legislature had placed the responsibility to determine the solvency solely upon the commissioner, appellant states: "A similar responsibility is vested in the banking commissioner." We answer by saying that liquidation and receivership authorized in chapter 78 of the insurance code is dissimilar to the rights vested in the banking commissioner.

The stipulation of the parties and the remanding order of this Court and the order of the circuit court, as hereinbefore set forth in this opinion, disclose that the court and the parties to this litigation agreed that defendant was to continue operating as a going concern between the date of decree and final determination by this Court. ·Conceding that to be true, nothing in law or fact prevents this Court from passing final judgment as to insolvency on all facts before us at the time of final determination, nor are we restricted in judgment because of the commissioner's previous conclusion that a receiver should be appointed.

The final and all-important question is as to whether this Court should declare defendant insolvent and order liquidation and receivership.

This case is unique in many respects. Before final determination we have had the advantage of 5 previous conclusions, namely: the commissioner's, the Ingham circuit court's, and those of 3 States, Ohio, Indiana, and Florida, none of which opposes the Ingham county circuit court's decree of solvency.

The commissioner does not declare defendant company to be insolvent, but, after stating that "the financial aspects of an insurance corporation are highly complicated" and that the court was correct in concluding defendant solvent in comparison with ordinary companies and corporations, states:

"There can be no other conclusion drawn than that a domestic insurer, such as Michigan Surety, must have its solvency or insolvency determined on a statutory accounting basis. The format used for such accounting is as set forth in the annual statement form prescribed by the commissioner and provided for by section 438 of the code."*

Ohio joined with the commissioner, and the commissioner referred to this fact in his reply brief, quoting Ohio as follows:

" 'If it is impossible for one State to rely upon the ability of a sister State to enforce its statutory accounting requirements, it becomes impossible for such State to properly regulate the insurance business done by a foreign insurance company in its State.' "

Indiana, joined by Florida, not only repudiated Ohio's stand on this question, but unequivocally stated that the citizens of their States would be injured by this Court's order declaring defendant insolvent. We quote again Indiana's statement to this

---

* CLS 1956, § 500.438 (Stat Ann 1957 Rev § 24.1438).—REPORTER.

Court at the time of our order in respect to the stay
of proceedings following the Ingham circuit court's
decree:

"It is the position of the State of Indiana that
Michigan Surety Company is not in fact insolvent,
and that the position of its creditors, stockholders,
and policyholders, are not in fact jeopardized. That
the company is solvent in fact, is not denied in any
of the auditor's reports, and was admitted upon cross
examination of petitioner's expert witnesses."

An examination of the records and briefs sub-
mitted to this Court establishes not only that ap-
pellant did not in any way attempt to refute Indiana's
position in this regard, but that the record sustains
Indiana's statement that defendant is not insolvent.

The opinion of the lower court is as follows:

"Well, gentlemen, we have been here now the
better part of 6 days. I have tried to be very patient
with every witness on both sides of this controversy
and allowed all evidence to be presented that either
side wished to present.

"This court has a very grave responsibility here
before it this morning in saying whether or not this
company should be in receivership or whether it
should not. The court has to be convinced that a
receiver is necessary before one is appointed.

"I will say right now, in view of all the testimony
that I have heard in the last 6 days, that I am not
convinced that it is going to be for the best interests
of everybody if a receiver is appointed for this com-
pany.

"I am not going to review all the evidence or all
the figures that we have before us, but we have on
the blackboard figures that have been there now for
about 5 or 6 days.

"First of all, in the assets side in regard to this
real estate, I am going to throw out, as far as any
consideration of this court, the real estate owned
here in the city of Lansing, because I do not believe

that that is a proper asset. It is an asset of the company but the property is not a proper asset.

"But the real estate listed up here at $531,548, including the Florida real estate, was taken, according to the evidence produced here at this hearing, as payment for a debt which was owed the Michigan Surety Company, and under the insurance code of Michigan that is a proper asset.

"Then there are trusteed accounts. The rest of the items there, as far as the smaller items are concerned, are bookkeeping differences between the auditors on one side of the State and the auditors on the other side of the company. But there is no question but what they are assets there in this trusteed accounts, the advances on contracts, and the bail account.

"On the other side, the amounts that are set up for reserve for unpaid losses, those are disputed items, and there is no question but what Michigan Surety Company will realize considerable amounts of money from those accounts.

"We have the $404,000 item. That amount of money was owed to the Michigan Surety Company by the Insurance Corporation of America. They saw fit to cancel that obligation by a bookkeeping transaction and the payment of that debt. So that reduces the liabilities of the company $404,000, and on the other side you increase the assets of the company by $531,000 plus the other items. And taking all these matters into consideration, I believe the company is solvent.

"We also have exhibit 25, which is an offer from the Insurance Corporation of America to purchase $405,000 worth of stock of the Michigan Surety Company. That would become an asset of the company and be available to carry on their business.

"They also state that they would accept the Lansing property, the Chicago property, and the Tampa property in the amount of around $252,000 in cancellation of a debt of somewhat over that amount

that is owed by the Michigan Surety Company. In other words, that would cancel that asset.

"That would leave the Brevard property, I believe it is, in Florida, and that property can be sold, and it is an admitted asset, according to this hearing, of the company.

"Now, this court, as I say, can do 1 of 2 things: Appoint a receiver; or deny a receiver. I do not believe, if there is a chance for this company which has been operating here in Lansing for 45 years to continue to operate on a sound ·basis, that this court would be justified in appointing a receiver for it. I do not think the evidence has shown that. I think the evidence has shown that the company, when you take all these assets and the plan that they have to rehabilitate the company, that they are in the black and can operate without any loss to any policyholders or anyone else.

"So I am going to grant the petition of the company to return the company to the board of directors. I am going to deny the petition of the State for the appointment of a receiver."

We believe the record sustains the lower court's opinion and decree, and nothing in the insurance code precluded the chancellor from so concluding. As this is a trial *de novo* this Court has the right to consider and does consider the transactions that have occurred since said opinion and decree, and we conclude that the lower court's opinion and decree have been strengthened by such transactions.

We affirm the decree of the lower court. No costs, a public question being involved.

CARR and BLACK, JJ., concurred with KELLY, J.

SOURIS, J. On October 30, 1959, the commissioner of insurance filed his bill of complaint in the Ingham county circuit court for the appointment of a receiver to liquidate the business of defendant Michigan

Surety Company. He alleged that an examination
of the records of Michigan Surety and its affiliated
companies disclosed that it was insolvent and that
further transaction of its business would be hazard-
ous to the public and to its policyholders and credi-
tors because of its insolvency, because of certain
specified transactions with related corporations all
controlled by Mark Kroll, president of each, and
because of certain other events jeopardizing the
financial condition of the company. The transac-
tions alleged by the commissioner to have resulted
in diversion of Michigan Surety's assets to Kroll and
his other controlled corporations, and the other
events relied upon by the commissioner, may be sum-
marized as follows:

1. Michigan Surety was stripped of cash and other
liquid assets by transfers to and for the benefit of
its parent corporation, Insurance Corporation of
America, an Indiana corporation, and other Kroll-
controlled companies and undeveloped real estate,
which it was unlawful for Michigan Surety to own,
substituted therefor.

2. Under agency agreements between Michigan
Surety and other Kroll-controlled companies, those
companies were permitted to collect annual insurance
premiums and cash deposits from policyholders of
Michigan Surety and, instead of remitting all such
premiums and deposits to Michigan Surety forth-
with, the Kroll-controlled companies remitted only
the pro rata monthly portion of such annual pre-
miums, thereby retaining for themselves the free use
of the balance of the annual premiums and all of
the cash deposits.

3. Under another agreement between Michigan
Surety and another Kroll-controlled company, cash
collateral deposited by Michigan Surety's agents and
brokers writing its bail bonds was diverted from a

bank account in Michigan Surety's name to other Kroll-controlled corporations.

4. By agreements between Michigan Surety and other Kroll-controlled companies authorizing them to write insurance business in Michigan Surety's name for a fee, Kroll had virtually unlimited authority to bind the company without regard to the hazards to it.

5. Michigan Surety's books and records were so kept that they failed to properly reflect the company's assets and liabilities.

6. Michigan Surety failed to maintain reserves, or adequate reserves, to reflect its unearned premiums collected as required by law and by generally accepted insurance accounting practices.

7. Michigan Surety substantially understated its reserves for claims and for loss adjustment expenses.

8. For the 3-year period ending in 1958, Michigan Surety incurred a net operating loss of $865,000 and for the subsequent 6-months' period an additional net operating loss of $141,000.

9. In May of 1959 a cash dividend was paid when there was no earned surplus from which a dividend lawfully could be paid.

The commissioner's bill of complaint concluded by alleging that his examination disclosed Michigan Surety, as a result of the transactions and events above summarized, to be in such condition that it could not meet the requirements for incorporation and authorization to do business in Michigan.

Upon filing of the bill of complaint an order issued directed to defendant to show cause why the commissioner should not be appointed its receiver for liquidation. On November 5, 1959, the return date of the order to show cause, and by stipulation, an order was entered appointing an operating committee for the company comprised of the commissioner, the company's executive vice president and one of

the company's outside directors.   The court's order appointing the operating committee granted it discretionary powers to operate the company's business in its normal manner for 45 days or until further court order.   The same order appointed Joseph Froggatt & Company to audit Michigan Surety's books (and also the books of certain of the other Kroll-controlled companies, to which those companies apparently assented) as of October 31, 1959; ordered that Insurance Corporation of America's holdings of capital stock of Michigan Surety "be placed in an irrevocable proxy, to be voted in the unanimous agreement of the operating committee"; and enjoined suits by creditors and claimants of Michigan Surety.   On November 18, 1959, again by stipulation, the order appointing the operating committee was amended to permit the company to pay all proper claims against it arising under its surety or insurance polices in an amount not to exceed $5,000 without prior approval of the court.

In the meantime, one day prior to the return date of the order to show cause, defendant filed its answer to the order to show cause, but at no time has there been filed an answer to the commissioner's bill of complaint.   On January 5, 1960, defendant's answer to the order to show cause was amended.   The original answer alleged denial by the commissioner of an administrative hearing before institution of this suit and asserted that the issue for determination by the court was its solvency under the provisions of the Michigan insurance code of 1956.[1]   The answer alleged that it was solvent; that the commissioner's examination report treated various assets and liabilities erroneously; and that, should it be determined necessary or advisable to increase the capital and surplus of the company, it was prepared to do

[1] CLS 1956, § 500.100 *et seq.* (Stat Ann 1957 Rev § 24.1100 *et seq.*).

so up to $1,000,000. The amended answer was filed after the Froggatt audit as of October 31, 1959, had been completed, which audit showed a surplus deficit of $1,145,000 and, after deducting capital stock of $658,000, a deficit to policyholders of $487,000. The amended answer to the order to show cause alleged a number of errors in the Froggatt audit and claimed that the company's capital was in fact unimpaired and that it had a $542,000 surplus.

At a hearing on January 8, 1960, following submission of the Froggatt audit and filing of the defendant's amended answer to the order to show cause, the chancellor entered an order reciting (1) that the Froggatt audit disclosed that Michigan Surety was in such condition that its further transaction of business would be hazardous to its policyholders, its creditors, and the public; and (2) that the company was insolvent, its condition being such that it could not meet the requirements for incorporation and authorization under the insurance code. He thereupon appointed the commissioner custodian of Michigan Surety, directing him "to take possession of its property, assets, and the conduct of its business"; to negotiate and reinsure the business of the company; and to liquidate such of its assets as he deemed advisable, subject to the court's approval. Upon the same date, the chancellor appointed Rudolph E. Reichert, the outside director of the company who had previously served as a member of the court-appointed operating committee, as friend of the court.

A few weeks later, defendant filed a petition to discharge the custodian in which was proposed a plan for extricating the company from its financial difficulties.

On February 25, 1960, the commissioner as custodian filed a petition to liquidate the company, alleging that his efforts to reinsure the company's risks,

to find adequate new capital, or to sell the company had been fruitless and that the financial condition of the company had steadily worsened.

Both the company's petition to discharge the custodian and the custodian's petition to liquidate were brought on for hearing in April, after the company's petition had been amended, Froggatt had prepared upon the court's order a new audit as of December 31, 1959, and the company had filed an answer to the custodian's petition to liquidate.   Testimony was taken and exhibits offered in evidence over a period of 6 trial days, at the conclusion of which the chancellor rendered a bench opinion deciding in favor of the company's contentions concerning the inclusion of certain disputed assets and exclusion or reduction of certain disputed liabilities on its balance sheet. He thereupon concluded that the company was solvent and, taking account of the management's plan to rehabilitate the company, denied the custodian's petition to liquidate and granted the company's petition to discharge the custodian.

On April 18, 1960, a decree was entered dismissing with prejudice the commissioner's bill of complaint, as well as denying his petition to liquidate and granting the company's petition to discharge the custodian.   We note in passing that at no time prior to hearing, either in the company's petition or in its answer to the custodian's petition, did the company pray for dismissal of the bill of complaint.   In the opening statement of company's counsel such request was made for the first time.   No further reference to dismissal of the bill was made by either party in the opening statements.   Thereupon, proofs were taken, not upon the bill of complaint but upon the parties' respective petitions, and such proofs dealt almost exclusively with the question of Michigan Surety's solvency.

Following entry of the court's decree, the commissioner filed claim of appeal therefrom and a petition for stay of proceedings. Subsequently, pursuant to stipulation of the parties, this Court entered its order holding the petition for stay of proceedings in abeyance and remanding the cause to the chancellor with authority to consider motions and to issue orders and directives necessary and appropriate to Michigan Surety's financial transactions and the orderly conduct of its business, all such orders and directives to be subject to our review upon this appeal. Concurrently, again by stipulation, the chancellor entered an order setting forth certain ground rules for the operation of the company during the pendency of this appeal. The details of that order are unimportant to our determination of this appeal.

The only issue determined by the chancellor, the issue both parties considered controlling in the disposition of the petitions before him, was Michigan Surety's solvency. It is the major issue presented by this appeal and may be stated as follows: Is an insurance company's solvency to be determined by generally accepted accounting principles applicable to ordinary commercial businesses or by standards more conservative?

The New York legislature has answered this question as it affects insurance companies doing business in that State by enacting legislation which specifies what assets and liabilities, and to what extent, are to be considered in determining such a company's financial condition. 27 McKinney's Consol. Laws of New York (1949) and 1961 Supp, art 5, §§ 70–104. For example, the New York law lists certain assets which may be considered and others which may not. The former are called "admitted assets" and all others are described as assets not admitted. Michigan does not have comparable comprehensive legislation. Nevertheless, Michigan's insurance commis-

sioner contends that solvency of Michigan's insurers, for State regulatory purposes, is to be determined by accounting methods essentially identical with those required to be applied in New York by that State's legislature.

We have previously acknowledged that the insurance business is affected with a public interest and that insurance laws are liberally construed so as to favor, not only the interests of the public, but also of policyholders and creditors. *Dearborn National Insurance Co.* v. *Commissioner of Insurance,* 329 Mich 107; and *Commissioner of Insurance* v. *American Life Insurance Co.,* 290 Mich 33. To that end we are bound to give full effect to legislative efforts to regulate the business of insurance as it is carried on in this State, but we may not go beyond that which our legislature has done by adoption of that which New York's legislature has done.

Our legislature has limited the right of insurance companies to own particular types of assets and to make particular types of investments. Were we to rule in this case that an insurance company which has violated such legislative proscriptions nevertheless may include in its balance sheet assets it is forbidden to own, we would thwart the legislative purpose instead of giving it effect. Hence, to the extent the Michigan Surety Company seeks to have included in its assets, for the purpose of determining its solvency in this proceeding, the value of property it has acquired in contravention of this State's laws, such value must be excluded.

The commissioner claims that real estate appraised at approximately $505,000 should be excluded for this very reason,—that it was acquired in violation of law. He also claims that a $405,000 debt owed Michigan Surety Company's parent corporation, which was sought to be canceled by a series of intercorporate book entries, was not effectually can-

celed or otherwise paid and, therefore, that Michigan Surety's liabilities should be increased by that amount. These are the items Michigan Surety conceded in its briefs on appeal governed the chancellor's determination of its solvency. Other balance sheet entries are disputed, but if the commissioner's contentions relating to these 2 transactions are correct, Michigan Surety was indeed insolvent regardless of the treatment accorded the remaining disputed items. It is my conclusion, reviewing the entire record *de novo* as we do, that the commissioner was correct in both instances. Accordingly, the 2 mentioned transactions will be examined hereafter at some length.

Before considering these transactions in detail, it is necessary to examine Michigan Surety's relationship with other corporations and certain individuals involved in the transactions. The relationships described are not insignificant to the resulting intercorporate manipulations disclosed to us in this record. Transactions between Michigan corporations incorporated under the general corporation law and their directors or other corporations having common directors are carefully scrutinized by legislative mandate. CLS 1956, § 450.13 (Stat Ann 1959 Cum Supp § 21.13). It would be anomalous to permit such dealings by an insurance company with its directors or other corporations with common directors without at least equal scrutiny, in view of the public interest affected by the insurance business.

The head of the commercial empire of which Michigan Surety Company is an important part is Mark Kroll. At the time the commissioner instituted these proceedings, Mr. Kroll was president and a director of each of the companies hereafter named. Approximately 94% of the capital stock of Michigan Surety Company was owned by Insurance Corpora-

tion of America, an Indiana corporation, which Kroll controlled. He also owned or otherwise controlled Agency Corporation of America, Surety Underwriters, Incorporated, Wilmark Insurance Company, and had some unstated interest in National Leasing Company and Hancock Trucking Company. At or about the time the commissioner of insurance filed his bill of complaint herein, Insurance Corporation of America, Michigan Surety's parent corporation, had entered into a reinsurance agreement with Michigan Surety; Agency Corporation of America was handling Michigan Surety's transportation insurance business for a 30% commission as authorized agent of Michigan Surety; and Surety Underwriters, Incorporated, was the bail bond manager for Michigan Surety. Wilmark was a subagent of Agency Corporation of America and had written a small amount of business for Michigan Surety. National Leasing had purchased Michigan Surety's automobiles and office equipment and then leased them back to Michigan Surety. Part of the purchase price for the cars and equipment was given to Michigan Surety in the form of capital stock of National Leasing.

At the time of the filing of the bill of complaint, Michigan Surety held various parcels of real estate in Florida, Illinois, and Michigan, at a book value of $552,000. In the commissioner's view, only real property of the value of $20,000 should be considered in determining Michigan Surety's solvency because all of the rest of the real property had been acquired in violation of section 948 of the insurance code of 1956, CLS 1956, § 500.948 (Stat Ann 1957 Rev § 24.-1948). That section prohibits insurance companies from purchasing or holding any real estate except "such as shall have been conveyed to the company in satisfaction for debts; or in the merger with or reinsurance of other companies"; and except in cer-

tain other limited circumstances not material to the facts of this case.

Real estate carried on Michigan Surety's books at a value of about $505,000 had been acquired in the following fashion:

In March of 1956, shortly after Insurance Corporation of America acquired stock control of Michigan Surety, the 2 companies entered into a reinsurance agreement, with a collateral agreement regarding assumption of outstanding losses and loss reserves, whereby Michigan Surety reinsured with Insurance Corporation of America certain of its existing risks to the extent of 100% of its unearned premium, including its net retained portion of previously reinsured risks and all future risks written by it. This reinsurance agreement immediately preceded cancellation of a long-standing reinsurance agreement between Michigan Surety and Wolverine Insurance Company (a company which the record before us fails to disclose is related by ownership or management with the Kroll-controlled companies mentioned above). At the time of cancellation of the reinsurance agreement with Wolverine Insurance Company, Wolverine claimed an accrued profit due it from Michigan Surety in the amount of $259,000, a claim which Michigan Surety then apparently disputed, all of which is reflected in an insurance department examination report of Michigan Surety as of March 31, 1956. By the beginning of 1958, the entire $259,-000 had been paid Wolverine by Michigan Surety and in 1958 an additional $63,000 was paid as Wolverine's share of equities in claim reserves developing during the years 1957 and 1958 on risks subject to the Wolverine reinsurance agreement.

In December of 1958, Kroll desired to increase Michigan Surety's surplus to policyholders. G. W. Draper, Michigan Surety's executive vice president and also a vice president of Insurance Corporation

of America, wrote to Kroll advising him that the reinsurance agreement between Michigan Surety and Insurance Corporation of America "is open to interpretation and arbitration as it pertains to certain moneys paid Wolverine by Michigan Surety Company for which there has been no reimbursement" (presumably from Insurance Corporation of America). Draper suggested to Kroll that Michigan Surety's surplus to policyholders could be increased if Insurance Corporation of America were to reimburse Michigan Surety for the amounts it had paid Wolverine. Apparently, the interpretation of the Insurance Corporation of America reinsurance agreement required to effect the result desired was accomplished without the arbitration to which reference was made by Draper, for the reimbursement occurred shortly thereafter in a manner which gave rise to the dispute concerning Michigan Surety's ownership of real estate. The fact is that Insurance Corporation of America's reimbursement to Michigan Surety took the form of conveyances to the latter of real estate rather than payment in cash.

The real estate was conveyed to Michigan Surety by Insurance Corporation of America by quitclaim deeds. It was for the most part undeveloped real estate which Insurance Corporation of America had acquired in 1958 from the Highway Insurance Company of Chicago, also by quitclaim deeds, in exchange for its assumption of that company's in-force liabilities. It will be remembered that the book value for the real estate received from Insurance Corporation of America was about $505,000. The difference between this book value and the $259,000 payment to Wolverine by Michigan Surety for which reimbursement was sought thus to be made was not a gratuity from Insurance Corporation of America to Michigan Surety. Indeed, value was paid by Michigan Surety for the remaining balance of book

value of the real estate. This balance was handled on the basis of a so-called reimbursement to Michigan Surety of about $63,000 in expenses paid by Michigan Surety ostensibly in behalf of Insurance Corporation of America and by a sale of so-called salvage items to Insurance Corporation of America of the value of $184,000, which salvage items consisted of collateral taken by Michigan Surety upon the issuance of construction contractors' bonds.

Accepting Michigan Surety's explanation of this real-estate transaction, it is quite clear that so much of the book value of the real estate as is attributable to the sale of salvage items cannot be considered as an asset of Michigan Surety in determining its financial condition in this proceeding for the reason that at least that much of the real estate was acquired by direct purchase, contrary to the provisions of section 948 of the insurance code of 1956. It remains to determine whether the balance of the real estate can be said to have been received in satisfaction for debts within the meaning of section 948.

There is substantial dispute between the commissioner and Michigan Surety concerning the $63,000 of expense items sought to be reimbursed from Insurance Corporation of America. The commissioner claims that these items of expense which make up the total figure were really obligations of Agency Corporation of America which Michigan Surety paid and not obligations of Insurance Corporation of America. Whether this is so or not is not crucial to our determination of the nature of this transaction. Even assuming that the expenses were legitimate expenses of Insurance Corporation of America, paid for by Michigan Surety and for which reimbursement properly should come from Insurance Corporation of America, this is not the kind of debt the statute permits to be satisfied by conveyance of real estate to an insurance company.

We reach the same conclusion with reference to the $259,000 item regarding which there is a similar vigorous dispute between the parties, the commissioner maintaining that it did not constitute a debt owed by Insurance Corporation of America to Michigan Surety except, perhaps, as a "debt of convenience."

The fact of the matter is that both of these items, we are convinced from the evidence produced, were used by the parties to the transactions solely for the purpose of transferring title of nonliquid assets from Insurance Corporation of America to Michigan Surety Company. Under no circumstances conceivable can the statute be so interpreted that the limited relaxation of its general ban on real-estate transactions by insurance companies to permit ownership of real estate acquired in satisfaction for debts could be broadened to include transactions such as here involved. Hardship to policyholders, creditors, the public, and to stockholders of insurance companies would result if the companies were powerless legally to accept real estate in satisfaction of debts where the only reasonable possibility for the satisfaction of such debts lies in acceptance of the debtor's real estate. There is no other reasonable explanation for exercise of the legislature's grace in relaxing to that extent its otherwise almost absolute ban upon ownership by insurance companies of nonliquid real estate. There was no evidence offered below that would permit these transactions between parent and subsidiary corporations to be so described.

Book value of the real property here involved to the extent of the total of the amounts paid to Wolverine Insurance Company and the expenses paid in behalf of Insurance Corporation of America by Michigan Surety cannot be considered in determining Michigan Surety's solvency, any more than could the balance of the book value of that property

attributable to the sale of salvage items to Insurance Corporation of America. It is our conclusion that $505,000 of Michigan Surety's real estate was acquired in violation of law and should not have been considered by the chancellor as an asset of the company in determining whether or not it was solvent.

The second major item in dispute concerns the attempted cancellation of a $405,000 liability owed by Michigan Surety to its parent corporation, Insurance Corporation of America. The trial chancellor ruled that the liability was in fact satisfied. Our contrary ruling, joined with our ruling concerning the real-estate transaction described above, compels our finding Michigan Surety insolvent.

Like most of the transactions involved in this litigation, this one is complex and requires a description of the relationship between Michigan Surety and a number of other companies, all but one of which are Kroll-controlled companies. Agency Corporation of America was Michigan Surety's agent in the procurement of transportation insurance business. It remitted the premiums it collected from time to time to Michigan Surety. Insurance Corporation of America was Michigan Surety's loss-paying agent and when losses occurred would pay claims made by Michigan Surety's policyholders and would subsequently seek repayment from Michigan Surety. Insurance Corporation of America had still another function in connection with the transportation insurance business of Michigan Surety, however. It came about in this way: Michigan Surety had entered into a reinsurance agreement with Continental Casualty Company by which Continental Casualty reinsured 90% of Michigan Surety's risk on that business and received therefor 90% of the premiums collected. Continental Casualty had, in turn, a contract with Insurance Corporation of America ret-

roceding all of its Michigan Surety reinsurance, retaining only a 1% commission therefor.

At the time the bill of complaint was filed, Michigan Surety owed Continental Casualty $538,000, referred to in the record as the July premium balance, as the result of the reinsurance agreement. On October 30, 1959, the day on which the bill of complaint was filed, a $538,000 check was drawn by Michigan Surety Company in favor of Continental Casualty. On the following Monday, November 2, 1959, this check was tendered to representatives of Continental Casualty who, we are told, would normally have in turn simultaneously tendered to Insurance Corporation of America, Continental Casualty's check in the same amount less its 1% commission pursuant to its retrocession agreement with Insurance Corporation of America. This double tender of checks became, in practice, an exchange of checks, by virtue of the fact that the officers of Michigan Surety who tendered its check to Continental Casualty would, as officers also of Insurance Corporation of America, receive Continental Casualty's check in exchange. On the occasion in question, on November 2, 1959, Continental Casualty refused the tender of Michigan Surety's check unless it was certified. The check was never certified, for there were not sufficient funds in Michigan Surety's account to cover the check. An officer of Michigan Surety testified that it was anticipated that sufficient funds would be received that day from Agency Corporation of America to cover Michigan Surety's check to Continental. The funds never arrived. It is a fair inference from the testimony and the other evidence adduced at the hearing that Michigan Surety anticipated a transfer of funds from Insurance Corporation of America to Michigan Surety, either directly or through Agency Corporation of America, in order to cover their Continental

Casualty check and that when Continental Casualty refused to accept Michigan Surety's uncertified check in exchange for their own to Insurance Corporation of America, their expectations were aborted.

Following the appointment of the operating committee for Michigan Surety by the trial chancellor on November 5, 1959, an attempt was made to pay Insurance Corporation of America $405,000 owed by Michigan Surety for loss claims paid in its behalf by Insurance Corporation of America. If successful, Michigan Surety's liabilities would be reduced in that amount for purposes of determining its solvency in this proceeding. This transaction, the commissioner claims, is part and parcel of the Continental Casualty transaction described above. On November 12th, without approval from, or even advising, the operating committee appointed by the court, officers of Michigan Surety wrote a check in the amount of $133,000 to Insurance Corporation of America in repayment of that corporation's disbursement of loss claims. Subsequently, journal entries were made on Michigan Surety's books reflecting a further reduction of the amount due Insurance Corporation of America by $405,000. This was not accomplished by payment in cash but rather by a three-cornered transaction involving Michigan Surety, Insurance Corporation of America, and Agency Corporation of America. The commissioner suggests that the Continental Casualty claim was also involved, the total of $405,000 and $133,000 equaling the $538,000 due Continental Casualty for the July premium balance.

At this time, Agency Corporation of America owed Michigan Surety a substantial sum for premiums it had collected on transportation insurance business it had generated as Michigan Surety's agent. Michigan Surety, in turn, owed Insurance Corporation of America about $578,000 for claims the latter had

paid in its behalf as loss-paying agent. Agency Corporation of America transferred real estate (which Agency Corporation of America had acquired from Wilmark Insurance Agency, which in turn had acquired it from Hancock Trucking Company, both of which were also Kroll-controlled companies) at a value of $551,000 to Insurance Corporation of America. Insurance Corporation of America recorded the real estate on its books by crediting $405,000 of its value in partial satisfaction of the $578,000 debt owed it by Michigan Surety and the balance of the real estate's value was credited to a debt owed it by Agency Corporation of America. Journal entries reflecting this transaction on the books of Michigan Surety were made on December 4, 1959, crediting payment of $405,000 from Agency Corporation of America on its transportation business premiums due Michigan Surety and debiting Michigan Surety's liability to Insurance Corporation of America in the amount of the aforesaid $405,000.

When these transactions were brought to the attention of the operating committee, after the fact, objection was made by the commissioner as a member of the operating committee, and ultimately the journal entries reflecting the $405,000 credit to Agency Corporation of America and the debit of $405,000 on the obligation to Insurance Corporation of America were reversed. The commissioner's position in this proceeding is that the transactions reflected in the journal entries were completely unsupported by any evidence within the control of Michigan Surety and, in the absence of a legally valid satisfaction, discharge, receipt, or release, he could not treat the liability as having been reduced. We agree and observe in passing that a debtor's own journal entries are hardly adequate to support a defense against a creditor's claim. The chancellor

erred in reducing Michigan Surety's liabilities by the amount of $405,000.

Accordingly, having determined that about $505,-000 of real estate should have been excluded from Michigan Surety's assets and $405,000 should have been added to its liabilities in determining its solvency, it is incumbent upon us to reverse the chancellor's finding that Michigan Surety Company was solvent and that its affairs should be returned to the control of its board of directors.

We were told by Michigan Surety's counsel during oral argument and by supplemental brief that its financial condition has so improved since the decree below while its affairs have been conducted by its regularly constituted board of directors and officers that affirmance is dictated by current conditions, even if we should differ with the chancellor's conclusions reviewed in the light of circumstances existing at the time of the hearing below. Further, we are told that certain plans affecting the financial status of the company are ready for implementation conditioned only, of course, upon favorable outcome of this appeal.

Included in the events which have reportedly improved the condition of the company are reduction of the par value of Michigan Surety's capital stock and resolutions of Michigan Surety's board of directors purporting to forswear any future dealings with any company in which Mark Kroll has an interest without first obtaining the approval of the commissioner of insurance. As to this latter item, the board of directors' resolution, there was also submitted to the chancellor, and to us, an agreement between Michigan Surety and Agency Corporation of America, Surety Underwriters, Inc., Insurance Corporation of America and Mark Kroll by which the purpose of the resolution is attempted to be effectuated by agreement of the interested parties. It

should be quite obvious that no board resolution or agreement between the parties so closely related as are these corporations and Mark Kroll could have the binding effect essential to accomplishment of the purpose stated. What these parties have done, or attempted to do, they can undo with a single stroke of the same pen. If their purpose is to be effectuated it can be effectuated only by a judicial decree in effectively mandatory terms.

There is also submitted to us a posthearing surplus note, so-called, issued by Michigan Surety to Insurance Corporation of America in the amount of $276,000, which we are told will improve the financial condition of Michigan Surety. There is also submitted to us a posthearing offer by a trustee acting for undisclosed principals to purchase from Insurance Corporation of America the capital stock of Michigan Surety it owns for the price of $650,000. All of these matters should receive careful judicial consideration after full testimonial hearing, which this Court is in no position upon the record before it to give to the transactions described.

We are mindful of the consequences which might follow reversal of the chancellor's findings, consequences adverse to the owners (both corporate and human) and to the employees of Michigan Surety. However, we are also mindful of our previous acknowledgment that the insurance business is affected with a public interest and that insurance laws are liberally construed so as to favor, not only the interests of the public, but also of policyholders and creditors. *Dearborn National Insurance Co.* v. *Commissioner of Insurance,* 329 Mich 107, and *Commissioner of Insurance* v. *American Life Insurance Co.,* 290 Mich 33. To that end we are bound to give full effect to legislative efforts to regulate the business of insurance.

This record discloses a deliberate disregard for legislative enactments designed to assure the people of this State, in the first instance, that their insurance companies shall be, and remain, not only solvent, but liquid,[2] and, in the second instance, that when judicial control is exercised over the affairs of any such company it shall be exercised effectively.[3]

First, we have spread before us a series of paper transactions between closely related insurance companies the net effect of which was to strip Michigan Surety of $505,000 of badly needed cash and liquid assets and to replace them with nonliquid undeveloped Florida real estate. That the principal beneficiary of this series of transactions, except on paper, was Insurance Corporation of America, Michigan Surety's parent corporation, is not significant, or so we are told. Second, soon after the commissioner's bill of complaint was filed herein, the company's officers unsuccessfully attempted repayment of one $538,000 obligation by check not covered at the time of tender by sufficient bank credits and, after the operating committee had been appointed by the chancellor to conduct the affairs of the company, its officers entered into a highly unorthodox, 3-cornered transaction (again with its parent corporation and another affiliated corporation) in another related effort to reduce its liabilities by $405,000, all without the approval of the chancellor's operating committee *or even its prior knowledge.*

Many other dubious transactions were revealed by the commissioner during the proceedings below, but they are relatively insignificant in the light of

---

[2] CL 1948, §§ 550.103, 550.104 and CLS 1956, §§ 500.900 to 500.960, as amended, particularly § 500.948 (Stat Ann 1957 Rev §§ 24.243, 24.244, and §§ 24.1900 to 24.1960, as amended, particularly § 24.1948).

[3] CLS 1956, § 500.7800 *et seq.*, particularly §§ 500.7802, 500.7810, 500.7814, and 500.7818 (Stat Ann 1957 Rev § 24.17800 *et seq.*, particularly §§ 24.17802, 24.17810, 24.17814, and 24.17818).

the transactions above mentioned. These, we believe, require continuing judicial scrutiny of the conduct of Michigan Surety's affairs and a far more effective control over its officers than that exercised heretofore.

To permit transactions between interrelated corporations, one of which is under the judicial control of an operating committee granted the obligation and authority to conduct its operations with discretionary powers, without the approval or even the knowledge of the operating committee, would completely destroy the control over the affairs of that company attempted to be exercised by the court through the operating committee.

To affirm the chancellor's decree and thereby to release this company from judicial control would constitute, in our view, an open invitation to plunder its already depleted treasury by officers whose vigilance, diligence, and skill are seemingly exercised, not at all for the interests of the public, the company's policyholders and its creditors, but solely for the benefit of its corporate parent. Were we dealing with an ordinary commercial business, what was here attempted might well be justified, for the interests of a company's stockholders, including a corporate parent, are paramount. But here we deal with a financial institution in which the public has a very significant interest, as do its policyholders and other creditors. The officers of such corporation live by a standard of conduct at least a cut above the morals of the market place. So our legislature has decreed and so we must demand.

In reversing the chancellor's decree in which he found Michigan Surety to be solvent and in which he returned the affairs of that company to its board of directors, we do not find it necessary to grant the commissioner's petition for appointment of a receiver to liquidate the company at this time. Assets

held by the company, including the Florida real estate discussed above, do have value even if they may not be considered in determining the company's solvency under our statute. There has also been disclosed in these proceedings a willingness by those in control of Michigan Surety and related companies to reduce effectively Michigan Surety's intercorporate liabilities. Sale or other disposition of such nonliquid assets and reduction of such intercorporate liabilities should first be attempted under judicial supervision through the court-appointed custodian. Other efforts at financial rehabilitation or reinsurance should, of course, be attempted, failing which a new petition for appointment of a receiver to liquidate the company would then be appropriate, or final disposition of the issues raised by the bill of complaint may be made after answer and full testimonial hearing.

Reversed and remanded. No costs.

TALBOT SMITH, EDWARDS, and KAVANAGH, JJ., concurred with SOURIS, J.

DETHMERS, C. J., did not sit.