BACHELDER *v.* BRENTWOOD LANES, INC.

1. CORPORATIONS — ATTORNEY — AUDITOR — CONSPIRACY — FRAUD
—EVIDENCE.

Trial court's dismissal of plaintiff minority stockholder's charges
of conspiracy,· fraud, or liability for improper action of de-
fendant corporation *held*, proper as to defendant attorney
and auditor under record presented.    .

2. SAME—SALARIES—COURTS.

A court is bound to allow considerable leeway on what is reason-
able in the matter of salaries paid by corporations, especially
where there is a dispute as ·to what salaries should be paid
and how things should be managed, and it is only when they
are completely out of line that the· court will do something
about them.

3. SAME—MINORITY STOCKHOLDER'S SUIT—EXCESSIVE SALARIES—AT-
TORNEY FEES—EVIDENCE.

Decree in minority stockholder's suit for accounting and other
relief ordering defendant president of corporation, its majority
stockholder, to repay a specified sum to corporation beyond a
reasonable salary and fixing amount of attorney fee for de-
fendants' attorney for defending the individual defendants and
attorney fee for defense of the corporate defendant but denying
all other relief is affirmed under record presented on *de novo*
review.

Appeal from Wayne; Murphy (Thomas J.), J.
Submitted November 7, 1962. (Calendar No. 48,
Docket No. 49,318.) Decided February 6, 1963. Re-
hearing denied April 5, 1963.

Bill by Harold Bachelder, a minority stockholder,
against Brentwood Lanes, Inc., a Michigan corpo-
ration, Eugene Musial, Thomas Foley, and Ted A.
Garback for accounting, repayment of sums paid out
in excessive salary, receivership, and dissolution.
Decree denying relief as to defendants Foley and
Garback, directing defendant Musial to repay cer-

---

REFERENCES FOR POINTS IN HEADNOTES
[1–3] 13 Am Jur, Corporations §§ 450–460.

tain sums paid him in salary, denying other relief against corporate defendant, and directing payment of attorney fees from corporate funds. Plaintiff appeals. Affirmed.

*Cassese, Batchelder, Jasmer & Evanski* (*John von Batchelder,* of counsel), for plaintiff.

*Goetz & Goetz* (*John F. Goetz,* of counsel), for defendant Brentwood Lanes, Inc.

*Thomas J. Foley,* for defendants Musial, Foley, and Garback.

Dethmers, J. Plaintiff owns 1,499 shares and defendant Musial, hereinafter called the defendant, 1,501 shares of stock in defendant corporation. These represent an initial investment by each, upon formation of the corporation, of $10 per share. They were and are the sole stockholders. The corporation owns and operates a bowling alley business. Defendant, an accountant with executive and business experience, proposed to plaintiff going into the business venture together. Plaintiff had had years of experience in connection with bowling alleys. Defendant then was general manager of a construction company. It owned vacant property which he considered a good location for a bowling alley. His employer was willing to construct upon it the requisite building for that purpose and lease it, on favorable terms, to defendant because he had confidence in defendant's character and business ability. An agreement was reached under which defendant would have the controlling interest. Plaintiff was to be the maintenance manager at a salary of $125 per week. The defendant helped get the money for plaintiff for his part of the investment, signing notes for that purpose and persuading defendant's mother to loan part of it to plaintiff. While the building was

in process of construction plaintiff was put on the payroll, without duties, at $100 per week, because he needed the money, although the business did not commence operation for some time thereafter. When the business opened plaintiff was paid $125 per week. Defendant was not then being paid. He became president and took care of the business and corporate part of the corporation's affairs without compensation. Plaintiff was secretary-treasurer and maintenance manager. Defendant, although he continued to be employed by the construction company, devoted a great deal of time to corporate affairs and secured much of the business for it. After the business had been in operation about 7 months plaintiff's pay was raised to $150 per week and defendant started receiving $50 per week. A half-year later the pay was increased to $200 per week for plaintiff and $100 for defendant. After another half-year, with both stockholders agreeing, the pay was made $350 per week for each. When this was done the business had been running for a little over a year and a half. Defendant testified that during that time he had been giving more and more time, increasingly, to the business of the corporation, so that, finally, he had to give up his job with the construction company. After operating for about 1 year under the $350 per week pay arrangement for both, defendant continued to draw $350 per week but removed plaintiff as secretary-treasurer and caused plaintiff's salary to be reduced to $150 per week on the grounds of incompetence and failure to do a satisfactory job as maintenance manager of the bowling alley, causing a great loss of business. That is when the trouble at bottom of this suit got under way. After a few weeks of working at the latter salary plaintiff quit working there and took a job at another bowling alley at $110 per week. No one was hired to replace plaintiff at the defendant corpo-

ration. Defendant testified that he undertook plaintiff's duties in addition to his own.

Defendant Garback is an accountant who has handled the auditing of defendant corporation's books and defendant Foley is an attorney, whom plaintiff says works for defendant. They were made directors of the corporation, with plaintiff and defendant, but have no money invested in defendant corporation, own no stock in it and do not draw anything from it except for such professional services as they may render the corporation as auditor or attorney, respectively.

Plaintiff's bill of complaint seeks an accounting from defendant, a decree requiring him to repay excessive salary drawn by him from the corporation, and appointment of a receiver to operate the bowling alley during pendency of the suit and to handle the liquidation and dissolution of the corporation and distribution of its assets to plaintiff and defendant. Plaintiff charges that defendant Musial and the other 2 defendants, who are not only his auditor and lawyer, respectively, but also directors of the corporation, have conspired to pay out the profits of the corporation to defendant Musial in excessive salaries, leaving nothing for dividends for plaintiff and making his shares in the corporation worthless.

For proofs, in support of plaintiff's charges against Garback and Foley, plaintiff showed only that they joined defendant Musial in voting to continue the $350 per week salary for him at the time plaintiff was reduced to $150 per week, thus continuing for Musial what plaintiff had joined in voting for himself and Musial 1 year before. At the conclusion of the proofs the trial court held that this failed to sustain any charge of conspiracy, fraud, or liability against Garback and Foley and ordered the bill of complaint dismissed as to them. In this we think the court was correct.

The chief issue in the case seems to be whether the $350 per week paid defendant Musial was excessive. The court found that a reasonable salary for defendant would be $225 per week and that that should be the figure thereafter unless the revenues of the corporation should experience a great increase. The court also found that during the corporate history defendant had drawn out of it $3,400 more than had the plaintiff and ordered him to repay that to the corporation. A decree entered giving effect to those findings and also requiring payment by the corporation to defendant Foley of $3,200 as attorney fees for defending the individual defendants in this suit and an attorney fee of $1,300 to the attorney defending defendant corporation, and denying all other relief sought in plaintiff's bill of complaint. Plaintiff appeals.

An understanding of the case and the reasons impelling the trial court to its decision may be gathered from the following excerpts from its opinion:

"I am of the opinion that the plaintiff's claim that there was fraud in the beginning of this venture is totally without foundation. Under his own testimony he knew that he was entering into a corporation; that he was to be a minority stockholder in the corporation, and the reason he was to be a minority stockholder was because the defendant Musial insisted on having the controlling interest and told the plaintiff so before he ever put up a nickel. The defendant Musial told the plaintiff that he was the majority stockholder; that he had the majority of the stock in order to settle disputes between them. The plaintiff went along with this for 4 years. * * * He knew that Mr. Musial controlled the corporation and could hire and fire employees. * * * He knew all of this before he ever put up a dime of his money. That is under his own testimony.

"Under the testimony of the defendant Musial it appears, and it is admitted by the plaintiff, that Mr. Musial had his employer build the building, had him rent it to him on what looks to me like a very reasonable rental basis. Mr. Musial's employer also gave him a big parking lot beside the bowling alley, and did not require even a down payment or a deposit or anything on the lease, which called for a rental of $1,200 a month. If the bowling alley went broke the first year he would have been stuck with the building, which he would not know what to do with, and he did all of this for Mr. Musial because of his belief in Mr. Musial's ability, and his friendship with him.

"Mr. Musial even went so far as to finance practically half of the $15,000 that Mr. Bachelder had to raise to put into the corporation. He signed notes for Mr. Bachelder, and prevailed upon his mother to loan Mr. Bachelder $2,000. He even went along with him to pay it at intervals. He also put him on the payroll in June before he put a nickel in the business at $100 a week. The plaintiff was paid to go and learn about the automatic pin machines. He took a course in that and his expenses were paid and his salary was paid. In fact, within 2 years the plaintiff was paid nearly $40,000, and his stock value increased. He was offered $20,000 for his $15,000 worth of stock and he refused it, and he also refused to consider $30,000 for it. It seems to me that is an awfully peculiar way to defraud somebody. If the defendant Musial wanted to defraud Mr. Bachelder he would not do it by giving him back his original investment and thousands of dollars more in 2-years time.    *    *    *

"Mr. Bachelder says that he complained about the salaries. I do not believe a word of that testimony. There was no complaint until he was fired, and the minutes show that he voted for all of the salary increases, and for the $350 for himself and the $350 for Mr. Musial. There is no question about that at all. There isn't any question about the fact that Mr.

Bachelder did not know anything at all about managing a bowling alley. All he knew was how to refinish pins and perhaps do something about the machines, and there is a question about that, a question about his ability as far as lacquering and shellacking of alleys. He is the only bowling man in the city of Detroit that insisted on 1 coat of lacquer for the alley approaches, according to the testimony here. The others used 2 and some of them 3 or 4. He did not know his job as an alley man, so far as I can see.

"Mr. Bachelder did not have anything to do with running the corporation. He was the secretary of the corporation, but he never prepared a minute. He says he never even read the minutes. Under the law you are bound by what you sign. If you sign something without reading it that is your hard luck. There is no testimony here that the minutes misrepresented anything, or that there was concealment or anything else. If a man is in business and he is the secretary of a corporation and he does not know enough to read the minutes before he signs them he is not a very good business man.

"Now, during all of this time Mr. Bachelder is being paid. He is being paid because he is out of a job and he hasn't any money, but Mr. Musial was doing as much work, as far as producing business all the time as he was. From June 18, 1956, to March 11, 1957, Mr. Musial did not draw a nickel, and yet he was doing more work to get leagues and business than Mr. Bachelder, because Mr. Bachelder did not do anything along that line. He worked days, and also had a counterman with him days. He went to the bank and on errands, to get parts for the machines and lacquer for the alleys, which managers generally do not do. You can send an office boy or errand boy to do that. Mr. Bachelder was not at the alleys when the leagues bowled. Everybody knows that in a bowling alley the success of the bowling alley depends upon the number of leagues you can get into the alleys, and the amount of business. Mr. Bachelder did not seem to know what the duties of a manager were, so far as I can see.  *  *  *

"Sitting as a court of equity I am not here to set definite figures. All I am here to do is to see there isn't a looting of the corporation in favor of the majority stockholders, that is all. Anything that is reasonable is all right. The court is bound to allow considerable leeway on what is reasonable, because each case depends on itself, and there is a difference of opinion as to what salaries should be paid and how things should be managed. Therefore the court has to allow considerable leeway. It is only when it is completely out of line that the court is called upon to do something about it.   *   *   *

"So now I get to the only question involved in the lawsuit, and that is the question of the $350 a week paid to Mr. Musial. It is clear to the court that this was voted unanimously by Mr. Bachelder and Mr. Musial, and there is no question about that. The minutes show it, and the minutes were signed by Mr. Bachelder as secretary. I am of the opinion, and I find from the evidence that Mr. Bachelder never complained about that until he was fired on February 19, 1959.

"Now, Mr. Musial received $350 a week and bonuses of $6,000 and $4,000. Mr. Bachelder and Mr. Musial both got that. I am inclined to believe, from the way the minutes were set up, and the way the salaries and the bonuses were paid, that it was in both their minds than an increase in salaries, and the giving of bonuses, would be better than declaring dividends, which they would have to pay taxes on, so it is not, in my mind, a realistic figure as to the salary.

"Now, on this question of salary we have quite a difference of opinion, there is quite a range from low to high. I do not think that this court can complain about any salary paid, unless it is way out of line, because that is a function of the corporation and the directors and officers, and the court is not going to set salaries every time there is an increase, and the court is not going to entertain lawsuits every time the stockholders or directors cannot agree on

minor matters of running a corporation. If that were so these problems would be before the courts all the time. The courts have refused, in most instances, to pay any attention to them, unless they are, as I say, way out of line.

"I think perhaps Mr. Musial's salary of $350 per week is out of line, compared with the salaries of other bowling alley proprietors in Detroit. I think it was purposely set at that figure to get away from paying Uncle Sam on the spread of dividends.

"In deciding this salary question the court must also remember that Mr. Bachelder was then receiving a salary of $150 a week and that he could have continued on at that rate, which he declined to do. Mr. Musial is now doing the same work with 1 less man. $150 a week is being saved to the stockholders of the corporation. When you are considering Mr. Musial's salary you have to consider the fact that before the $350 a week was set back in March, 1958, Mr. Bachelder was getting $200 a week, and there was no complaint about that either from Mr. Bachelder, according to the minutes.

"I think perhaps the best I can do is to say that I think a salary of approximately $225 a week would not be out of line for Mr. Musial. That is the closest I can come to it. I say that especially in view of the fact that they have done away with the $150 formerly paid to Mr. Bachelder, so I think that that type of a salary of $225 a week would be fair and just. * * *

"However, in this case the evidence clearly shows that Mr. Bachelder was not a manager, was not a secretary or treasurer; that he did not perform the duties he was supposed to; that at the most he was merely a repairman for the machines and saw that the alleys were properly taken care of. He did not know how many lines were bowled or what money was made or what was in the minutes. He knew nothing about it. He thought he ought to sit there and wait for everybody to come in. Even then he was only there in the daytime and not at night when the leagues bowled. He did not even keep the alleys

clean. He wanted it done one way and the customers another.

"Therefore although I do not think it was necessary to show that they had good grounds to remove him, I think the corporation and the directors had good grounds to remove Mr. Bachelder from the payroll. How can he complain about it, when according to his own statement he was getting too much money for the work he was doing? He was offered a job at $150 a week, which he said was what he was worth. They were going to keep him on at $150 a week. The other salary was not really a salary, but a salary, plus bonuses. I do not know how a person can blow hot and cold in the same breath. I do not see how he can complain about the fact that he was let go. * * *

"As far as the lawyers fees are concerned, I think Mr. Foley should be paid for his work, because I don't know why he or Mr. Garback were made defendants in this lawsuit. Whether they were made defendants properly or not, the plaintiff has failed to prove 9/10 of his charges, and therefore I think Mr. Foley is entitled to be paid, and I think he should be paid by the corporation. Mr. Goetz, representing the corporation, should also be paid by the corporation. The plaintiff by not coming into equity with clean hands and making all these charges of fraud, will have to pay his own lawyers."

While this is a chancery case which we hear *de novo*, we are satisfied that the trial court's opinion is amply supported by the record, that had we been in its position we would not have found otherwise, and that the portions quoted from that opinion support the decree.

Affirmed. Costs to defendants.

CARR, C. J., and KELLY, BLACK, KAVANAGH, SOURIS, and OTIS M. SMITH, JJ., concurred.

O'HARA, J., took no part in the decision of this case.