MILLER v MAGLINE, INC.

1. CORPORATIONS—STOCKHOLDER'S DERIVATIVE SUIT—EXCESSIVE COMPENSATION—CORPORATE OFFICERS—EQUITY—APPELLATE REVIEW.

   A stockholder's claim to recover, for the corporation, excessive compensation allegedly paid to corporate officers is a classic example of a stockholder's derivative suit; such suits are equitable in nature, and appellate review is *de novo* on the record.

2. CORPORATIONS—SHAREHOLDERS—DIVIDENDS—EQUITY—APPELLATE REVIEW—FACTUAL FINDINGS.

   A shareholder's action to compel the declaration and payment of a dividend is heard in equity, appellate review is *de novo* on the record, and the chancellor's factual findings will not be set aside unless clearly erroneous.

3. APPEAL AND ERROR—CHANCELLORS—FACTUAL FINDINGS—CLEAR ERROR.

   The factual findings by a chancellor are clearly erroneous where, although there is evidence to support them, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

4. APPEAL AND ERROR—CHANCELLOR'S FACTUAL FINDINGS—ABUSE OF DISCRETION.

   A chancellor's factual findings will be set aside only for an abuse

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 19 Am Jur 2d, Corporations § 1423.
[2] 19 Am Jur 2d, Corporations §§ 901, 903.
[3, 4] 27 Am Jur 2d, Equity § 266.
[5] 19 Am Jur 2d, Corporations § 1424.
[6, 7, 9] 19 Am Jur 2d, Corporations § 1423 *et seq.*
[8] 19 Am Jur 2d, Corporations § 1415.
[10] 19 Am Jur 2d, Corporations §§ 836, 847–849.
[11] 19 Am Jur 2d, Corporations §§ 847–849.
[12] 19 Am Jur 2d, Corporations § 1271 *et seq.*
[13] 19 Am Jur 2d, Corporations § 823 *et seq.*
[14] 19 Am Jur 2d, Corporations § 905.
[15] 19 Am Jur 2d, Corporations § 909.
[16] No Reference
[17] 27 Am Jur 2d, Equity § 102 *et seq.*
[18] 19 Am Jur 2d, Corporations § 589.

of discretion; to have an abuse the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, and not the exercise of reason but rather of passion or bias.

5. CORPORATIONS—EXECUTIVE COMPENSATION—EXCESSIVE COMPENSATION—SHAREHOLDERS—BURDEN OF PROOF.

Shareholders seeking the return of allegedly excessive compensation paid to corporate officers who are also directors of the corporation must bear the burden of proving that the compensation received by officer-directors of a corporation is excessive where each officer-director has abstained from voting on his own compensation at the board meetings.

6. CORPORATIONS—BOARD OF DIRECTOR MEETINGS—INCENTIVE BONUSES—BREACH OF FIDUCIARY DUTIES—REASONABLE COMPENSATION.

The failure to call a board of directors meeting to review incentive bonuses paid to corporate directors does not constitute a breach of a fiduciary duty owed by the directors to the stockholders where the compensation itself was reasonable; reasonable compensation is a question of fact, to be determined by all of the circumstances of the case.

7. CORPORATIONS—EXECUTIVE COMPENSATION—COURT INTERVENTION—FRAUD.

The courts will not readjust the amount of executive compensation paid to a corporation's officer-directors without concrete proof that such compensation evidences wrongdoing or inexcusable oppression to the point of being fraudulent.

8. CORPORATIONS—BONUS COMPENSATION.

Bonus compensation for corporate officer-directors embodies in principle the payment of liberal compensation in good years and moderate compensation in lean years.

9. APPEAL AND ERROR—CHANCELLOR'S FINDINGS—BONUS COMPENSATION—CORPORATIONS—OFFICERS—DIRECTORS.

A chancellor's finding that the bonus compensation paid to a corporation's officer-directors was reasonable will not be disturbed where the finding is based on adequate consideration of the circumstances and is supported by the evidence.

10. CORPORATIONS—DIRECTORS—DECLARATION OF DIVIDENDS—EQUITY—INTERFERENCE WITH MANAGEMENT—COURTS—SURPLUS NET PROFITS—FRAUD—BREACH OF GOOD FAITH.

The directors of a corporation, and they alone, have the power to

declare a dividend of the earnings of the corporation and to determine its amount; courts of equity will not interfere with the exercise of that power unless it is clearly made to appear that the directors refuse to declare a dividend when the corporation has a plain and abundant surplus of net profits which it can, without detriment to the business, divide among its stockholders, and when a refusal to do so would amount to such an abuse of discretion as would constitute a fraud or breach of that good faith which they are bound to exercise towards the stockholders.

11. EQUITY—CORPORATIONS—DIRECTORS—STOCK DIVIDENDS—JURISDICTION—FRAUD—BREACH OF TRUST—BAD FAITH—WILFUL NEGLECT—ABUSE OF DISCRETION.

A very strong case is required to induce a court of equity to order the directors of a corporation to declare a dividend, inasmuch as equity has no jurisdiction unless fraud or a breach of trust is involved; the discretion of the directors will not be interfered with by the courts, unless there has been bad faith, wilful neglect, or abuse of discretion.

12. APPEAL AND ERROR—EQUITY—CORPORATIONS—DIRECTORS—STOCK DIVIDENDS—BREACH OF FIDUCIARY DUTIES—STOCKHOLDERS.

A chancellor's conclusion that actions by a board of directors in failing to declare a dividend constituted a breach of their fiduciary duty to the stockholders was not clearly erroneous where the Court of Appeals found: (1) the chancellor concluded that the directors by receiving handsome bonus incentives had placed themselves in a position in which it was impossible for them to render an impartial decision on the declaration of the dividend; (2) the chancellor found that the directors' admitted nondividend policy defeated one of the major purposes of a profit corporation, the accumulation and distribution of profits to corporate owners, and (3) the chancellor gave due consideration to the asserted need for plant and product diversification and the prospect of possible renegotiation liability in arriving at his conclusion that a dividend ought to be declared.

13. APPEAL AND ERROR—EQUITY DECREES—ABUSE OF DISCRETION—STOCK DIVIDENDS—CHANCELLORS.

A chancellor may frame an equity decree for the declaration and payment of a stock dividend with reference to the period of high corporate earnings encompassed by the pleadings and upon present actual and probable future conditions and needs of the company; it is not an abuse of discretion to weigh future uncertainties in determining present value.

14. CORPORATIONS—STOCK DIVIDENDS—WITHHOLDING DIVIDENDS—
    COMMUNITY RESPONSIBILITY.

    Community responsibility to the depressed area where a corpora-
    tion conducts its operations cannot be the basis for justifying
    the withholding of stock dividends which otherwise ought to be
    declared.

15. TORTS—CORPORATIONS—SHAREHOLDERS—FIDUCIARY DUTY—
    BREACH BY OFFICERS—DIVIDENDS—STATUTE OF LIMITATIONS—
    STATUTES.

    A shareholder's claim that the director-officers of a corporation
    have breached their fiduciary duty to the stockholders by
    refusing to declare a dividend out of the surplus being retained
    by the corporation sounds in tort; therefore, the three-year
    statute of limitations contained in the statute regarding actions
    to recover damages for injuries to persons or property applies
    to such an action (MCLA 600.5805[7]; MSA 27A.5805[7]).

16. EQUITY—CHANCELLORS—ABUSE OF DISCRETION—RETAINING JURIS-
    DICTION—CORPORATIONS—STOCK DIVIDENDS.

    A chancellor does not abuse his discretion in retaining jurisdic-
    tion of an action, in which he orders the declaration and
    payment of a stock dividend, to determine whether an addi-
    tional dividend should be awarded in the event the defendants
    continued wrongfully to withhold dividends where the circum-
    stances that led him to conclude that a dividend should be
    ordered remain unchanged at the time he enters his decree and
    where the decree does not interfere with the management of
    corporate affairs, provide for ongoing supervision of corporate
    affairs, or order future dividends.

17. EQUITY—EQUITABLE RELIEF—PRAYER—CONDITIONS AND EQUITIES.

    The shape of equitable relief is not of necessity controlled by the
    prayer, but is fashioned by the chancellor according to the
    conditions and equities existing at the time the decree is made.

18. COSTS—EQUITY—CHANCELLOR—ATTORNEY FEES AND EXPENSES—
    STOCK DIVIDENDS—STOCKHOLDERS.

    A plaintiff stockholder may be denied reimbursement from corpo-
    rate funds for attorney fees and expenses incurred in an action
    seeking the declaration and payment of a stock dividend where
    the plaintiff has not brought funds into the corporate treasury
    and his interests are adverse to those of all other stockholders.

Appeal from Bay, John X. Theiler, J. Submitted

January 4, 1977, at Lansing. (Docket No. 25812.) Decided June 20, 1977. Leave to appeal applied for.

Complaint by Raymond V. Miller and John R. Thorpe against Magline, Inc., Stanley See, Don C. Law, George Monroe, Raymond Graves, Carl F. Schilling, and Carl N. Mortenson to compel the declaration and payment of stock dividends and to recover allegedly excessive compensation paid to certain corporate officers. The chancellor ordered Magline's directors to declare and pay a dividend, retained jurisdiction for the purpose of determining whether further dividends should be awarded, and dismissed the excessive compensation claim. Defendant Magline appeals from the dividend award and the chancellor's retention of jurisdiction. Plaintiffs cross-appeal from the dismissal of their excessive compensation claim. Affirmed.

*Lynch, Gallagher & Lynch* and *Milton Y. Zussman,* for plaintiffs and cross-appellants.

*Law, Weathers, Richardson & Dutcher* (by *W. Fred Hunting, Jr.),* for defendant and cross-appellee Magline, Inc.

Before: Danhof, C. J., and Bashara and R. M. Maher, JJ.

Danhof, C. J. On December 27, 1967, plaintiffs, minority shareholders, brought this action to compel the declaration and payment of dividends and to recover allegedly excessive compensation paid to named corporate officers. Trial was completed on April 29, 1970 and, in an opinion dated June 23, 1973, the chancellor concluded that a dividend should be declared, but denied the excess compensation claim, finding the compensation paid to

defendant officers to have been reasonable. The amended judgment, dated September 15, 1975, ordered defendant Magline's directors to declare and pay a dividend of $75 per share for the period from July 1, 1963 to June 30, 1968, dismissed plaintiffs' excessive compensation claim, and retained jurisdiction to determine whether dividends should be awarded for the period from July 1, 1968 to June 30, 1973. Magline has appealed from the dividend award and the chancellor's retention of jurisdiction. Plaintiffs have taken a cross-appeal from dismissal of their excessive compensation claim.

Plaintiff Miller and defendant Law incorporated Magline. Law has served as president to the present, but Miller is no longer a corporate officer. Within a few months after Magline's incorporation, plaintiff Thorpe joined the company as an officer and director. By 1959 defendants Schilling, Graves, Monroe, Mortenson, and See had joined the company. The board presently consists of plaintiffs Miller and Thorpe, Raymond G. Miller (plaintiff Miller's son), and the individual defendants Law, Schilling, See, Graves and Monroe.

Plaintiffs own approximately 41% of the 4,138 shares of Magline stock issued and outstanding; defendants own the remaining 59%.[1] By virtue of their majority holdings and executive offices, defendants control all aspects of corporate activity.[2]

[1] Several years before trial the articles were amended to increase the number of authorized shares to 5,000, reducing their par value from $100 to $10. Plaintiff Miller owns 1,140 shares; plaintiff Thorpe owns 565. Individual defendants Law, Schilling, See, Graves, Monroe, and Mortenson own 1,290, 411, 387, 115, 50, and 128 shares, respectively; the remaining 52 shares are held by persons related to Mortenson, Schilling and Law.

[2] In November, 1962, the board established an executive committee consisting of defendants Law, See, Graves, Monroe, and Schilling, to which most of the board's powers in relation to the business and affairs of the corporation were delegated. In 1966 all stockholders

Magline has experienced considerable success in the field of commercial and defense related applications of magnesium and related light metals. Up to the time of trial Magline had consistently shown a profit on its overall operations, but it had never paid a dividend. Instead, the board has adhered to the policy adopted in 1950 by Law, Miller, and Thorpe of compensating corporate managers by means of a low base salary coupled with an incentive bonus plan based on a percentage of earnings, with the remaining profits being retained by the corporation to be used as working capital. This policy was satisfactory to all concerned so long as the principal shareholders were actively participating in management and sharing in the incentive bonus compensation plan.

In 1962, however, important changes occurred. Plaintiff Miller was seriously injured and thereafter ceased to play an active role in corporate management. In the same year, plaintiff Thorpe resigned as vice-president of Magline. Both Thorpe and Miller continued as directors and shareholders of Magline, however.

On November 10, 1962, the board adopted resolutions confirming defendants Law, Monroe, See, Schilling, and Graves in their respective offices of president and general manager, vice-president in charge of engineering, vice-president in charge of sales, secretary, and treasurer and assistant secretary. Whereas previous resolutions had provided for employment "during the fiscal year", the 1962 resolutions provided for employment "during the fiscal year ending June 30, 1963 and until his successor be duly elected and qualify", thereby rendering annual resolutions unnecessary. The

---

except plaintiffs entered into a ten-year voting trust agreement, under which defendants Law, Schilling, and See, as trustees, vote all stock except plaintiffs'.

employment resolutions provided for low base sala-
ries and fixed the incentive bonuses for Law, Mon-
roe, See, and Graves at an aggregate of 23% of net
earnings before taxes and profit-sharing.[3] Because
Miller and Thorpe were no longer officers, they
were excluded from the incentive bonus program.

Prior to 1962 the board met annually to vote on
management compensation and to fix corporate
policy for the ensuing year. Because the board
authorized the formation of an executive commit-
tee to supervise corporate affairs, at the 1962
meeting, and because the employment resolutions
specified open-ended terms of office, the board did
not meet again until February 19, 1966, when it
met at plaintiffs' request. As a result, the employ-
ment resolutions adopted at the 1962 meeting
remained in effect until February, 1966. During
that time corporate earnings, and hence incentive
bonuses, increased dramatically.[4] These increases
stemmed primarily from Magline's increased pro-
duction under government defense procurement
contracts during the Viet Nam War years.

At the February 19, 1966, meeting the board
reduced the percentages by which the incentive
bonuses of Law, Monroe, See, Graves, Mortenson,

---

[3] Law, Monroe, See, and Graves were to receive 8, 5, 5, and 5%,
respectively.

[4] In 1962 Law received total compensation, including salary, incen-
tive bonus, and retirement profit sharing, of $10,016. From 1963 to
1968 his total compensation was as follows: 1963, $22,664; 1964,
$92,419; 1965, $137,558; 1966, $75,402; 1967, $120,183; 1968, $107,887.
The decline in 1966 and ensuing years resulted from reduction of his
incentive bonus from 8 to 4% by the board at the February, 1966
board meeting.

In 1962 total executive compensation was $65,576, approximately
82% of Magline's earnings. From 1963 to 1968 these figures were as
follows: 1963, $83,620, 59.99%; 1964, $286,293, 46.64%; 1965,
$418,399, 50.49%; 1966, $260,442, 47.76%; 1967, $424,509, 38.81%;
1968, $380,360, 39.67%.

Magline's earnings surplus increased from $459,710 to $2,492,156
during the period from 1963 to 1968.

and Schilling were computed to an aggregate of 14-1/2% of net earnings before profit-sharing and taxes.[5] At the October 22, 1966, meeting the board adopted essentially identical compensation resolutions for the fiscal year ending June 30, 1967, with plaintiffs abstaining from voting, as at the February, 1966 meeting. The board rejected plaintiffs' motion to declare a $10 dividend at the October, 1966 meeting, and like motions at the 1967 and 1968 board meetings were also defeated.

Law testified that the fiscal years from 1964 through 1969 were the most profitable in Magline's history. In 1963 Magline had net income of $55,760 on gross sales of $2,024,901 with earned surplus of $226,620. In 1968, Magline had net income of $569,670 on gross sales of $10,429,988 with earned surplus of $2,492,156.

## I

The plaintiffs' claim to recover, for the corporation, excessive compensation allegedly paid to the individual defendants is a classic example of a shareholder's derivative suit. See *Dean v Kellogg,* 294 Mich 200, 207; 292 NW 704 (1940). Such derivative suits are equitable in nature, *Bachelder*

---

[5] Schilling and Mortenson were included in the incentive bonus program in 1966. The reduction from 23% to 14-1/2% was coupled with substantial increases in the base salary of each officer. Law's base salary was increased from $12,000 to $36,000; Graves' from $9,000 to $22,000; Monroe's from $9,000 to $24,000; See's from $10,000 to $22,000; Schilling's from $2,000 to $4,000 (in addition he received fees for his accounting services); and Mortenson's from $2,000 to $15,500.

The board also adopted a resolution at the February, 1966 meeting granting Law additional deferred compensation of $10,000 per year of service, retroactive to July 1, 1965.

Each officer-director abstained from voting on his own compensation, as at the 1962 meeting. Plaintiffs abstained from voting on the compensation resolutions introduced at the February, 1966 board meeting.

*v Brentwood Lanes, Inc,* 369 Mich 155, 164; 119 NW2d 630 (1963), *Dean v Kellogg, supra, Burch v Norton Hotel Co,* 261 Mich 311, 314; 246 NW 131 (1933), and consequently our review is *de novo* on the record. *Dozier v Automobile Club of Michigan,* 69 Mich App 114, 123; 244 NW2d 376 (1976). Notwithstanding defendant's contention to the contrary, a shareholder's action to compel a dividend is heard on the equity side. *Dodge v Ford Motor Co,* 204 Mich 459, 500, 501; 170 NW 668 (1919), *Miner v Belle Isle Ice Co,* 93 Mich 97, 113, 115, 117; 53 NW 218 (1892), *Hunter v Roberts, Throp & Co,* 83 Mich 63, 71; 47 NW 131 (1890). Therefore, our review of the chancellor's decree relating to the dividend claim is *de novo* on the record as well. *Stachnik v Winkel,* 394 Mich 375, 383; 230 NW2d 529 (1975).

Although our review of chancery cases is *de novo,* the chancellor's factual findings will not be set aside unless they are clearly erroneous. GCR 1963, 517.1, *Ford v Howard,* 59 Mich App 548, 552; 229 NW2d 841 (1975). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed". *Tuttle v Department of State Highways,* 397 Mich 44, 46; 243 NW2d 244 (1976), quoting *United States v United States Gypsum Co,* 333 US 364, 395; 68 S Ct 525, 542; 92 L Ed 746, 766 (1948). The chancellor's determinations based upon his findings of fact will be set aside only for abuse of discretion, and "to have an 'abuse' in reaching such determination, the result must be so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the

exercise of reason but rather of passion or bias". *Spalding v Spalding*, 355 Mich 382, 384–385; 94 NW2d 810 (1959).

## II

Plaintiffs raise three closely-related claims in their cross-appeal from dismissal of their excessive compensation claim. Plaintiffs claim that the chancellor erred in failing to find that the board breached their fiduciary duty to the stockholders and the corporation by failing to call a director's meeting during the period from November 10, 1962 to February 19, 1966, for the purpose of reducing the incentive bonuses payable to the individual defendants, once it became apparent that Magline's spectacular earnings during that period would result in large windfalls to the individual defendants. Plaintiffs also contend that the chancellor erred in countenancing the continuation of the incentive bonus program after 1964 because plaintiffs were excluded from both the benefits of the program and corporate management by virtue of their status as minority stockholders. They contend that the chancellor should have determined the reasonable compensation for each individual defendant and decreed their compensation in the form of fixed salaries. Further, plaintiffs contend that the burden was on defendants to establish that the compensation received by them was reasonable, and that defendants failed to carry that burden.

The chancellor concluded that "plaintiffs have not demonstrated their right to bring an action for the corporation against these officers and directors and force them to return any of the payments made to them as compensation". Thus, the chancellor placed on plaintiffs the burden of proving that the compensation paid was unreasonable.

Plaintiffs contend that § 13(5) of the General Corporation Act,[6] which was in effect at the time of trial, gave defendants the burden of proving that their compensation was reasonable. The statute applies to self-dealing by directors of a corporation resulting in misappropriation of corporate assets. See, *e.g., Thomas v Satfield Co,* 363 Mich 111; 108 NW 2d 907 (1961), *Attorney General, ex rel Commissioner of Insurance v Michigan Surety Co,* 364 Mich 299, 326; 110 NW2d 677 (1961), *Mahlen Land Corp v Kurtz,* 355 Mich 340, 355; 94 NW2d 888 (1959). The short answer to plaintiffs' contention that § 13(5) places on defendants the burden of proving that the compensation was reasonable is that the section has no application in this case because no contract between the corporation and its directors is here involved. We recognize, however, that this does not take into account the problem presented in cases involving closed corporations in which, as here, officers often double as directors. Accordingly, we must consider the question more closely.

In support of their contention that the burden was on defendants to prove that their compensation was reasonable, plaintiffs rely on *Erdman v Yolles,* 62 Mich App 594; 233 NW2d 667 (1975). In that case defendants voted themselves a raise in salary after plaintiff shareholder left the employ of the closely held corporation, and the chancellor

---

[6] MCLA 450.13(5); MSA 21.13(5). That section provided: "No contract of any corporation made with any director of such corporation or with a partnership or other group or association of which any such director shall be a member or with any other corporation of which such director may be a member or director and no contract between corporations having common directors shall be invalid because of such respective facts alone. When the validity of any such contract is questioned, the burden of proving the fairness to the contracting parties of any such contract shall be upon such director, partnership, other group or association, or corporation who shall be asserting the validity of such contract." This section was repealed and replaced by 1972 PA 284, § 546, codified as MCLA 450.1546; MSA 21.200(546), after the time of trial.

placed the burden on defendants of proving the salaries they received after plaintiff left the corporation were reasonable. *Id.* 596, 597–598. This Court said:

"Under the law in effect prior to the effective date of the new Business Corporation Act the trial judge's decision in this regard was correct. *Holden v Lashley-Cox Land Co,* 316 Mich 478; 25 NW2d 590 (1947), *McKey v Swenson,* 232 Mich 505; 205 NW 583 (1925). The cases relied on by defendants for the law prior to the effective date of the new act, *Garwin v Anderson,* 334 Mich 287; 54 NW2d 667 (1952), *Wiseman v Musgrave,* 309 Mich 523; 16 NW2d 60 (1944), and *Nahikian v Mattingly,* 265 Mich 128; 251 NW 421 (1933), are not to the contrary but simply involve dissimilar factual situations." *Erdman v Yolles, supra,* at 598–599.

In the instant case, however, it is undisputed that each director-officer abstained from voting on his own compensation at the board meetings. In *Garwin v Anderson,* 334 Mich 287; 54 NW2d 667 (1952), plaintiffs complained of excessive salaries paid to the corporate president and other officers and on appeal defendants argued that the burden was on plaintiffs to establish that the salaries were unreasonable, relying on *Wiseman v Musgrave,* 309 Mich 523; 16 NW2d 60 (1944), while plaintiffs relied on *McKey v Swenson,* 232 Mich 505; 205 NW 583 (1925), for the contrary proposition. The Court said:

"Reading of the 2 cases and of 2 others therein cited, namely, *Nahikian v. Mattingly,* 265 Mich 128 [251 NW 421 (1933)], and *Miner v. Belle Isle Ice Co.,* 93 Mich 97 [53 NW 218] (17 LRA 412) [1919], discloses that *the rule imposing the burden of proof on defendants is applicable in cases where the action of the directors in fixing their own compensation is held void for the reason that it was accomplished by the vote of those benefiting*

*thereby." Garwin v Anderson, supra,* 295–296. (Emphasis added.)

After observing that it had not been shown that the fixing of salaries of officers or directors in that case had been accomplished by or dependent on the vote of the individual thereby benefited, the Court quoted with approval from *Nahikian:*

" 'In *McKey v. Swenson,* 232 Mich 505 [205 NW 583 (1925)], we held action in fixing salaries wholly void and cast the burden upon the officers to give the court information upon which reasonable compensation could be fixed. Such, however, is not the case at bar, for here we do not have wholly void action but only assertion of unreasonable compensation and the burden is on plaintiff to establish the charge.' " *Garwin v Anderson, supra,* at 296.

Thus, the chancellor correctly placed the burden on plaintiffs of establishing that the compensation received by the individual defendants was excessive. *Wiseman v Musgrave, supra, Luyckx v R L Aylward Coal Co,* 270 Mich 468, 474; 259 NW 135 (1935), *Nahikian v Mattingly,* 265 Mich 128, 131; 251 NW 421 (1933), *Burch v Norton Hotel Co,* 261 Mich 311, 315; 246 NW 131 (1933), *Erdman v Yolles, supra.*

With regard to plaintiffs' claim that defendant directors breached their fiduciary duty to the stockholders by failing to call a directors' meeting for the purpose of reducing their incentive bonuses, the chancellor agreed that defendants had been paid "handsome" amounts. The chancellor also agreed that it would have been difficult for defendant directors to undertake an impartial, independent review of their own salaries as officers, and he was "perturbed" by defendants' failure to address themselves to the question of execu-

tive compensation during the period from 1962 to February, 1966, when the percentage of the incentive bonuses was reduced by half. The chancellor found that plaintiffs "had little impact in causing any change of mind on the part of the management group"[7] and that "there was concerted action on the part of management in reviewing compensation".

Passing from consideration of the three-year hiatus between meetings, however, the chancellor observed that defendants' conflicting interests as directors and officers of this closed corporation did not necessarily mean that "the evils of such an arrangement are such that the baby must be thrown out with the bath water". He observed that the situation fostered "a driving desire by those who are in management and control to perform at the highest and most efficient level since they will directly benefit", and that the incentive bonus arrangement also tended to attract capable and interested management personnel who would be encouraged by the arrangement to "ride herd" on one another to insure that each made "an adequate contribution to the well being of the corporation".

After stating that the test to be applied was whether defendants' compensation was reasonable, and that "reasonableness in this connection must be an area or a broad spectrum of compensation", the chancellor concluded:

"We were impressed by the capabilities of the Magline management group and we are satisfied that the

_____

[7] Miller and Thorpe voted in favor of the compensation resolutions adopted at the November 10, 1962 board meeting. Plaintiffs did not oppose the compensation resolutions providing for reductions in the incentive bonuses, although they abstained from voting thereon. Neither plaintiff formally moved for retroactive reductions in executive compensation at the February 19, 1966 meeting.

success of the corporation is attributable in no small part to their efforts and attention to their duties. We are satisfied that they not only had a desire to further their own best interests, but also a desire to serve the best interest of the corporation.

"Magline's compensation plan for its officer-directors was primarily that of a contingent fee, as we have previously developed. This results in the probability that if the corporation is a success, the return to the officers will be at the high end. On the other hand, this is balanced by the consideration that bad times bring low returns. In view of the participation by the plaintiffs in this same type of plan, prior to their severance of employment connections with the corporation, we are satisfied that the payments to these officers are within the outer limits of reasonable compensation."

Entirely apart from the facts that plaintiffs voted in favor of the 1962 compensation resolutions, that under Magline's by-laws plaintiffs could themselves have convoked the directors at any time to review the bonuses,[8] and that plaintiffs failed to introduce any resolution calling for a refund to the corporation of any alleged excess compensation, defendants' failure to call a meeting of the directors could not constitute a breach of their fiduciary duties to the stockholders if the compensation itself was reasonable, as the chancellor found. Therefore, we proceed to consider plaintiffs' claim that the chancellor erred in finding that it was.

Whether compensation is excessive is a question of fact, in the determination of which all the circumstances of the case should be considered. *Luyckx v R L Aylward Coal Co, supra,* at 474, *Bachelder v Brentwood Lanes, Inc, supra,* at 162.

---

[8] Magline's by-laws provide that "special meetings shall be called by the President or Secretary * * * on the written request of two of the directors."

In *Nahikian v Mattingly, supra,* at 132, the Court said:

"We may not readjust the salary without a yardstick applicable to the particular circumstances and not even then upon mere difference of opinion from that of the board of directors, but only upon concrete proof that the salary evidences wrongdoing or inexcusable oppression to the point of being fraudulent. Less than this would constitute an intolerable interference with legitimate internal corporate management."

Although plaintiffs' expert on the question of executive compensation testified that compensation for officers of corporations similar to Magline was considerably lower than the levels of compensation paid to the individual defendants during the period from 1964 to 1968, he expressed no opinion on the reasonableness of their compensation. Defendants' experts, on the other hand, were both of the opinion that defendants' compensation was reasonable, taking into account their low base salaries, their demonstrated contributions to Magline's exceptional success, and the philosophy underlying the concept of incentive compensation. It is apparent that the chancellor found these factors persuasive in arriving at his conclusion that defendants' compensation was reasonable.[9] Defendants stood by the corporation during the relatively lean years preceding the period from 1964 to 1968,[10] and the chancellor thought they were entitled to share in the company's success during its good years.

[9] The chancellor stated that "For a concern that was as successful as Magline we are satisfied that the amounts provided by the base salary were extremely low". He also considered the other factors cited by defendants' experts as indicia of reasonableness.

[10] For the fiscal year immediately preceding the 1962 compensation resolutions defendants Law, Graves, Monroe, See, Schilling, and Mortenson received total compensation of only $10,016, $10,100, $10,606, $12,342, $3,722, and $2,063, respectively.

In *Roth Office Equipment Co v Gallagher,* 172 F2d 452, 456 (CA 6, 1949), the Court said, "If the principle of bonus compensation is to be recognized, it carries with it the payment of liberal compensation in good years and moderate compensation in lean years". We agree. Further, although not conclusive on the question of reasonableness, it is significant that the Internal Revenue Service concluded, after three successive reviews from 1964 to 1968, that the levels of executive compensation for the years in question were within the range of proper business expenses. The chancellor, too, thought this factor worthy of note.[11] He also thought it significant that plaintiffs had themselves participated in the incentive bonus program when they were employed by Magline,[12] and properly so. *Burch v Norton Hotel Co, supra,* at 314.

Although we agree with the chancellor that "$137,000.00 in one year is a substantial amount of money to pay even to the very successful president of the very successful corporation", this fact alone does not render the compensation paid to the individual defendants unreasonable under all of the circumstances of this case. We conclude that the chancellor's finding of reasonableness was

[11] "The mere fact that such payments were reviewed for tax purposes in the past and passed muster does not guarantee that in reviewing these payments we must accept those tests and standards adopted by the tax authorities as binding. This Court may have additional tests and requirements that it may use in reviewing and determining whether or not excessive compensation was paid to the officers of Magline, but we should not ignore those standards entirely, by any means."

The chancellor also found that the bonuses did not constitute a disguised dividend, and that from Magline's inception an incentive bonus program was "adopted with the purpose and objective of a fair and equitable way to reimburse the active management for their contributions made for the benefit of the fledgling corporation."

[12] Although Magline has paid no dividends, each plaintiff received well in excess of $200,000 in compensation, including incentive bonuses and profit-sharing, during his term of employment.

based upon adequate consideration of those cir-
cumstances, and that his finding is supported by
the evidence. Therefore we cannot say that a
mistake has been committed, and we decline to
disturb the chancellor's finding. *Tuttle v Depart-
ment of State Highways, supra.*

### III

Plaintiffs alleged that in withholding a dividend
defendants had violated the fiduciary duty which
they owed, as majority stockholders and directors,
to the minority stockholders, and that defendants'
refusal to declare a dividend was an arbitrary,
capricious, and unwarranted abuse of their discre-
tion. In the landmark case on court-compelled
dividends for closed corporations, *Dodge v Ford
Motor Co,* 204 Mich 459, 500; 170 NW 668; 3 ALR
413 (1919), the Court adopted the following state-
ments:

" 'It is a well-recognized principle of law that the
directors of a corporation, and they alone, have the
power to declare a dividend of the earnings of the
corporation, and to determine its amount. 5 Am. & Eng.
Enc. Law [1st Ed.], p. 725. Courts of equity will not
interfere in the management of the directors unless it
is clearly made to appear that they are guilty of fraud
or misappropriation of the corporate funds, or refuse to
declare a dividend when the corporation has a surplus
of net profits which it can, without detriment to its
business, divide among its stockholders, *and when a
refusal to do so would amount to such an abuse of
discretion as would constitute a fraud, or breach of that
good faith which they are bound to exercise towards the
stockholders.'*

\* \* \*

" 'When, therefore, the directors have exercised this
discretion and refused to declare a dividend, there will
be no interference by the courts with their decision,

unless they are guilty of a wilful abuse of their discretionary powers, or of bad faith or of a neglect of duty. *It requires a very strong case to induce a court of equity to order the directors to declare a dividend, inasmuch as equity has no jurisdiction, unless fraud or a breach of trust is involved.* There have been many attempts to sustain such a suit, yet, although the court do not disclaim jurisdiction, they have quite uniformly refused to interfere. *The discretion of the directors will not be interfered with by the courts, unless there has been bad faith, wilful neglect, or abuse of discretion.'* " (Emphasis added.)

Defendant contends that under the business judgment rule a court may not compel a dividend in the absence of clear and convincing proof of fraud, conspiracy, waste, or gross abuse of discretion by the board of directors. In so arguing, defendant carefully elides the statement in the rules above quoted that a court may compel a dividend when the board's refusal to declare one would constitute a "breach of that good faith which they are bound to exercise towards the stockholders". *Dodge v Ford Motor Co, supra,* at 500, quoting *Hunter v Roberts, Throp & Co,* 83 Mich 63, 71; 47 NW 131 (1890). Breach of this fiduciary duty amounts to a breach of trust, and has consistently been recognized in Michigan as a ground for court intervention. *Dodge v Ford Motor Co, supra,* at 500, see *Reed v Burton,* 344 Mich 126, 130, 131; 73 NW2d 333 (1955), *Barrows v J N Fauver Co,* 280 Mich 553, 558, 559; 274 NW 325 (1937), *Wagner Electric Corp v Hydraulic Brake Co,* 269 Mich 560, 566, 567; 257 NW 884 (1934), *Thompson v Walker,* 253 Mich 126, 134–135; 234 NW 144 (1931). The courts have also been sensitive to the "special problems inherent in the close corporation, and have applied corporate doctrine accordingly". *Darvin v Belmont Industries, Inc,* 40

Mich App 672, 677; 199 NW2d 542, 64 ALR3d 349 (1972). In *Thompson v Walker, supra,* at 135, the Court said:

"It is especially true, where one man or family controls and dominates a corporation, that he, or they, must act in the utmost good faith in the control and management of. the corporation as to minority stockholders."[13]

See 2 O'Neal, Closed Corporations (2d ed), § 8.07, p 44, § 8.08, pp 59–60.

The chancellor concluded that plaintiffs were entitled to a dividend:

"It is our opinion that under all of the circumstances of the case, that the directors of the management group were placed in the impossible situation of trying to give an impartial answer to the determination as to whether dividends should be granted. They already were taking a profit distribution via a percentile of profits before taxes. Therefore, we deem it an untenable position to argue that non payment of dividends is justified on the basis that such a concept of profit distribution would imperil the continued well being of the corporation. If such retention of profits were indicated they should have been more diligent in seeing that distributions based upon percentage of profits also should be curtailed.

\* \* \*

"We are of the opinion that a dividend should be declared for the years up to the time of the trial of this cause based upon the accumulated net undivided profits. To the extent that the management group, as directors, has adopted a non-dividend policy, we are of the opinion that it has defeated one of the major

---

[13] The chancellor found that after 1962 "the corporate affairs had been run pretty much according to the desires of Mr. Law, who was President, on the advice of the other officers without the advantage of formal Directors' meetings", and that the management group consisting of the dominant shareholders had control of the corporation.

purposes of a profit corporation, that is, to accumulate profits and divide them amongst the corporate owners when that is reasonable and proper. Under the circumstances here, their participating in a distribution to them of those profits and a squirreling away of the balance to meet future needs is, in our opinion, inequitable in not giving consideration properly to the needs and requirements of all of the stockholders of the corporation."

It is apparent that the chancellor found for plaintiffs on the basis of their breach of fiduciary duty theory. Accordingly, the question presented is whether the chancellor's conclusion that defendants' actions constituted a breach of their fiduciary duties was clearly erroneous.

Defendants contend that a dividend is inappropriate in light of the evidence that the corporation had working capital shortages, particularly in view of the provisions of Magline's by-laws with regard to the declaration of dividends.[14]

" 'To authorize the court to intervene, and decree a dividend, it ought, in the first place, to appear clearly that there are surplus profits to divide, and that such profits can be separated from the necessary working capital, for the purpose of a dividend, without serious detriment to the interest of the stockholders and the

---

[14] The by-laws provide that the directors shall have power, "Subject to any and all provisions and restrictions of the Articles of Incorporation or the laws of the State of Michigan, to declare dividends out of the net profits or earned surplus of the corporation at such time and in such amounts as the Directors may from time to time designate; provided, however, that nothing herein contained shall require the Directors to declare dividends from the net profits accruing to the corporation from time to time if, in the judgment of the Directors, such net profits should properly be retained for use as further working capital or to further the purposes of the corporation." MCLA 450.22; MSA 21.22, in effect at the time of trial, provided in part that "Nothing contained in this section shall prevent the directors of any corporation * * * from setting apart out of any of the funds of the corporation available for dividends a reserve or reserves for any proper purpose."

prosperity of the business of the corporation.' " *Hunter v Roberts, Throp & Co, supra,* at 65.

Defendants' experts testified that Magline had experienced working capital shortages,[15] but this testimony was based on the tests used by the Internal Revenue Service to determine whether a corporation is subject to the Federal accumulated earnings tax.[16] We agree with the chancellor that, although such testimony should be considered in determining the propriety of the directors' decision not to declare a dividend, it cannot be conclusive on the question of whether a dividend ought to be declared. The tax rules establishing a perimeter for accumulated earnings, which the company may not *exceed* without being subject to harsh penalties, cannot control when the question is whether the refusal to declare a dividend out of such surplus amounts to a breach of the directors' fiduciary duties to the stockholders.

Plaintiffs' expert testified that Magline had "a plethora of working capital, an overabundance of working capital",[17] and the chancellor correctly

[15] Defendants' experts testified that under the tests employed by the Internal Revenue Service Magline suffered from working capital "shortages" in the following amounts: 1965, $578,801; 1966, $322,464; 1967, $499,479; 1968, $1,555,264; 1969, $708,679.

[16] Int. Rev. Code of 1954, §§ 531–537; 26 USCA 531–537. "[S]ection 531 of the Code imposes an additional tax on corporations which are used to avoid individual tax through the accumulations of earnings. The basic policy is one of attempting to force a distribution of earnings through the threat of a penalty tax, a tax which may be avoided by distributing earnings or putting the accumulated earnings to use in the business." Chommie, Federal Income Taxation (2d ed), § 215, p 616. *See Apollo Industries, Inc v Commissioner of Internal Revenue,* 358 F2d 867 (CA 1, 1966).

[17] Magline's working capital constituted 66.8% of its assets, as compared to an average for companies in Magline's industrial classification of 31.2%. The ratio of earned surplus and paid in capital to total assets was 84.2%, as compared to an average of 52.8% for industries in Magline's industrial classification and 55.4% for all corporations having assets approximately the same as Magline's. Magline's quick assets (cash and cash equivalents) exceeded current

found that Magline has used "very little borrowed capital".[18] The chancellor's finding that defendants' admitted nondividend policy defeated one of the major purposes of a profit corporation, the accumulation and distribution of profits to corporate owners,[19] and his conclusion that, in view of the handsome distributions to defendants under the incentive bonus plan, their argument that a dividend would imperil the corporation was untenable, are supported by the record. Such findings justified the chancellor's interference with the discretion entrusted to the directors under the by-laws and MCLA 450.22; MSA 21.22, in effect at the time of trial. See *Dodge v Ford Motor Co, supra,* at 507. The company's by-laws cannot be used as a shield behind which breaches of the directors' fiduciary duty to the stockholders can be carried on with impunity. Our review of the record satisfies us that a dividend is not only "possible as a business proposition", but will also be made out of a "plain and abundant surplus".[20] *Barrows v J N Fauver Co, supra,* at 562.

Defendant contends that a dividend should not have been ordered because there was evidence that

liabilities by $1,064,000 at the time of trial. The ratio of this difference to total assets was 29.7%, as compared to an average of minus 1.3% for corporations in Magline's industrial classification. Plaintiffs' expert testified that few companies in the United States had quick assets exceeding current liabilities.

[18] Magline has taken short-term loans on occasion and retired them quickly; apart from these, the chancellor found that the company has never resorted to long-term borrowing, nor issued "anything except common stock as a source of funds or for investment."

[19] At the time of trial the book value of Magline stock, which had a par value of $10 per share, was $729 per share. Magline has never paid a dividend.

[20] At the close of the 1968–1969 fiscal year Magline had current assets totalling $2,959,732, including $343,980 in cash, $110,567 in bonds, $155,000 in notes receivable, net receivables of $1,003,486 and inventories of $1,289,136. Current assets for the 1967–1968 fiscal year totaled $3,957,668, including $2,500,000 in inventories. The dividend decreed amounts to $310,350.

Magline might be subject to government contract renegotiation liability,[21] and because of Magline's need for plant and product diversification. Clearly, the directors have discretion to reserve funds to meet "contingencies, both present and prospective", *Dodge v Ford Motor Co, supra,* at 502, but the prospect of contingent renegotiation liability did not preclude a dividend, so long as that factor was taken into consideration, as it was here,[22] in arriving at a determination that a dividend ought to be paid. Defendants Law and Graves testified that no plant acquisition was contemplated nor in progress, and the record is silent as to any concrete plans for plant improvement or product diversification.[23] The situation at bar is thus unlike that in *Barrows v J N Fauver Co, supra,* and *Dodge v Ford Motor Co, supra,* in which defendants had formally adopted plans for plant construction. Moreover, in the *Dodge* case the Court assumed that the expansion policy was in the best interest of the company and its shareholders, but concluded that it did not justify a withholding of dividends. *Id.* 508.

The chancellor noted that "Testimony was given to the fact that the plant, as used by the corporation, was becoming outmoded, outdated and requiring extensive renovation", but he concluded that

[21] Defendant Schilling estimated the company's potential liability at between $160,000 and $800,000. It was undisputed that this liability would be decreased by half as a result of credits for corporate income taxes paid on profits subject to the renegotiation claim.

[22] The chancellor stated: "[W]e are cited the fact that there is a possibility of a renegotiation liability since the period of time in which the corporation received large profits may result in federal government reviewing the income that the corporation received from its contracts and may result in orders reducing the amount of profit they made by requiring paybacks to the federal government."

[23] The record shows that from fiscal years 1965–1966 to 1968–1969 Magline expended a total of $305,709 for building acquisition and improvement.

"The arguments that the defense presents as justifying a policy of not declaring dividends in many respects undermines any reasonable expectation that the present book value of the stock can be or ever will be realized in the future". He went on to observe that, although "[book] value must be a present consideration", future uncertainties "must be weighed in determining present value". The chancellor was not convinced, however, that the prospect of renegotiation liability and the need for plant and product diversification justified the withholding of dividends. He considered that the same defendants who had received handsome distributions were arguing that the corporation could not afford a dividend, and concluded that they had placed themselves in a position in which it was impossible for them to render an impartial decision as to whether a dividend ought to be declared. We are satisfied that the chancellor gave due consideration to the asserted need for plant and product diversification and the prospect of possible renegotiation liability in arriving at his conclusion that a dividend ought to be declared, and we find no abuse of discretion.

Defendant next contends that a dividend should not have been declared because there was testimony predicting losses for the fiscal year ending in 1970. In *Barrows v J N Fauver Co, supra,* at 556, the Court said that "relief, particularly as to distribution of surplus, [must] be based upon present, actual and probable future conditions and needs of the company, and it cannot be resolved back to a situation which no longer exists". The chancellor observed:

"So long as the corporation continues to be successful it is suggested that the earnings and profits retained are needed for the corporation, that they are not going

to waste, but that the corporation will be able to use them. On the other hand, it is suggested to us that the future is bleak and that there will come a time when the corporation will not be able to earn a profit and that it will need all of its accumulated profits to meet the needs of the lean years. As the Plaintiffs ask, when if ever will a return be made to stockholders?"[24]

The chancellor concluded that defendants, who were receiving pretax distributions based on profits, could not be "expected to give proper consideration to other owners who are not receiving the largess of the corporation".

There is logic in this view. Moreover, this case is distinguishable from *Barrows*.[25] The parties stipulated to an amendment of the pleadings to include the fiscal year ending June 30, 1968, thereby limiting the dividend claim to the period from 1963 to 1968. The chancellor framed his decree with reference to that period of high earnings encompassed by the pleadings and the circumstances existing at the time of trial, nearly two years after that period ended. In contrast, plaintiff in *Barrows* relied on "[h]opes and expectations in 1933", when suit was filed, that "had been converted into realizations or disappointments in 1935", when the decree entered. Id. 556. We read *Barrows* not as requiring the chancellor to reopen the proofs continually up to the entry of his decree, but as requiring that the relief granted be based "upon present, actual and probable future conditions". That Magline might not show a profit

---

[24] Defendants Law and Schilling could not foresee a time when a dividend might be paid.

[25] In *Barrows* the chancellor ordered distribution of all surplus in excess of the corporation's stated capital. In this case plaintiffs sought a dividend of 50% of the earned surplus of approximately 2.7 million dollars, and presented expert testimony that a dividend of $664,000 would be appropriate. The dividend ordered by the chancellor amounts to $310,350.

in future years ought to have been, and was, taken into consideration in determining whether a dividend ought to be awarded, but that speculative possibility did not necessarily preclude relief. Having weighed future uncertainties in determining present value, the chancellor did not abuse his discretion.

Defendant also claims that the cyclical and highly competitive nature of Magline's government contract business rendered a dividend inappropriate. The chancellor considered this factor,[26] along with the possibility of future losses, and, balancing these reasons for concern about the company's future against defendants' participation in the handsome incentive distributions, concluded that a dividend should be decreed. We find no abuse of the chancellor's discretion in this regard. Nor did the chancellor err in ordering a dividend despite evidence that the corporation's failure to do so was motivated in part by its sense of community responsibility to the "depressed" area where Magline conducts its operations, a factor which the chancellor also considered. A sense of community responsibility, however laudable, cannot justify the withholding of dividends that otherwise ought to be declared. *Dodge v Ford Motor Co, supra,* at 504–507.

Defendant raises a cluster of closely related

---

[26] The chancellor noted that Magline is highly dependent on defense related contracts, and that the "need and necessity for such 'defense' materials is extremely variable". He also noted the correlation between Magline's peak earning years and the Korean and Viet Nam Wars. "Considerable reasons for the [non-dividend] policy were given by the management group and the thinking and logic of these directors and officers was buttressed by the testimony of the various witnesses concerning the needs and requirements of the corporation. We were shown that the corporation was in need of working capital, that it was a growing corporation, that it was engaged in high risk type of activity and a number of other reasons, as we have developed previously."

claims, which for convenience we will treat together. First, defendant contends that recovery of an unspecified portion of the lump sum dividend is barred by the statute of limitations contained in the former General Corporation Act, MCLA 450.47; MSA 21.47, in effect at the time of trial.[27] Since the application of that statute to the facts of this case would result in a two-year limitation on plaintiffs' action, defendant contends that distribution of an unspecified amount of the dividend attributable to profits from the 1964 and 1965 fiscal years is barred by the statute.

Under the facts of this case the statute of limitations relied upon by defendants has no application to plaintiffs' dividend claim. Plaintiffs have not alleged that defendants' refusal to declare a dividend constituted a violation of defendants' duties "whereby the corporation has been or will be injured or damaged, or its property lost, or wasted, or transferred to one or more of them", nor do plaintiffs seek to enjoin or set aside an unlawful transfer of the corporate property. Plaintiffs claim only that defendants have breached their fiduciary

---

[27] The statute provided in part:

"Action may be brought by the corporation, through or by a director, officer, or shareholder, or a creditor, or receiver or trustee in bankruptcy, or by the attorney general of the state, on behalf of the corporation against one or more of the delinquent directors, officers, or agents, for the violation of, or failure to perform, the duties above prescribed or any duties prescribed by this act, *whereby the corporation has been or will be injured or damaged, or its property lost, or wasted, or transferred to one or more of them, or to enjoin a proposed, or set aside a completed, unlawful transfer of the corporate property to one knowing the purpose thereof.* The foregoing shall in no way preclude or affect any action any individual shareholder or creditor or other person may have against any director, officer, or agent for any violation of any duty owed by them or any of them to such shareholder, creditor, or other person. *No director or directors shall be held liable for any delinquency under this section after six years from the date of such delinquency, or after two years from the time when such delinquency is discovered by one complaining thereof, whichever shall sooner occur."* (Emphasis added.)

The statute was repealed by 1972 PA 284.

duty to the stockholders by refusing to declare a dividend out of the surplus being retained by the corporation. For the statute to apply, the wrongs alleged must have injured or damaged the corporation. See, *e.g., Detroit Gray Iron & Steel Foundries, Inc v Martin,* 362 Mich 205; 106 NW2d 793 (1961), *Goodspeed v Goodspeed,* 273 Mich 87; 262 NW 742 (1935), *Hosner v Brown,* 40 Mich App 515, 541; 199 NW2d 295 (1972). That is not the case here.

Defendant argues persuasively that plaintiffs' action accrued on December 22, 1965, when plaintiffs had at their disposal all relevant financial information for fiscal years 1964 and 1965. Plaintiffs' action is premised upon a breach of fiduciary duty, which sounds in tort, and therefore their action was timely filed under the general statute of limitations contained in MCLA 600.5805(7); MSA 27A.5805(7).

Similarly without merit are defendant's contentions that the chancellor failed to relate the amount of the dividend to specific financial information for any single fiscal year, and that the dividend award was therefore arbitrary. Plaintiffs relied on defendant's own financial statements to establish the amount of earned surplus available for distribution, and defendant did not dispute the accuracy of its own figures.[28] Adopting these figures, the chancellor found that the book value of Magline stock was $2,725,246 in 1968, and that of

---

[28] Magline's financial statements were introduced as exhibits by both parties. Defendant corrected plaintiffs' proposed findings of fact by pointing out that plaintiffs had included paid in capital in its $3,000,000 total for earned surplus, and that the true total was $2,783,662, as shown on the financial statement. The chancellor accordingly found that plaintiffs had failed to prove that "there actually is that figure [$3,000,000] of earned surplus", and based his findings on the figures shown on defendant's financial statement for 1968, the last fiscal year encompassed by the pleadings.

this $2,492,156 represented earned surplus, equivalent to approximately $600 per share. Noting that defendants had received an average of $196,000 per year in salary and bonuses over the base period from 1958 to 1968, during which sales increased six times, book value four times, and net income before taxes more than 41 times, and taking into consideration that "no prior distribution had been made or was contemplated by the management group", the chancellor found that "distribution of a substantial portion of the retained earnings would be unwarranted". He concluded that "the history of the corporation and all of its surrounding circumstances warrant a dividend distribution of $75 per share". There is no precise formula for computing a dividend; in each case the amount must be determined with regard to all of the relevant circumstances. See *Dodge v Ford Motor Co, supra,* at 508–509. Our review of the chancellor's discursive opinion satisfies us that he did in fact consider all such circumstances in arriving at his determination, and we find no abuse of his discretion.

We have been at pains throughout this opinion to note the chancellor's findings on each issue raised by defendants. Having done so, we need only add that defendants' contention that the chancellor's opinion "did not constitute proper findings and facts and conclusions of law" is entirely without merit.

Finally, we have examined with care defendants' remaining contentions regarding the propriety of the dividend decree and find them *so* lacking in merit as not to warrant discussion.

IV

The chancellor retained jurisdiction to deter-

mine whether an additional dividend should be awarded for the period from July 1, 1968 to June 30, 1973, provided plaintiffs filed a petition for such purpose within 90 days after the decree entered. Plaintiffs did so, and defendant now contends that the chancellor erred in retaining jurisdiction.

We recognize that courts are, and should be, most reluctant to interfere with the business judgment and discretion of the directors in the conduct of corporate affairs. Here, however, the chancellor has found that the defendant board members were in a position in which it was "impossible" for them to give "an impartial answer to the determination as to whether dividends should be granted". The facts of the instant case present a study in the oppression of minority shareholders of a closed corporation by the majority, see 2 O'Neal, *supra,* at § 8.07, p 44, § 8.08, pp 58–60, and it was not improper for the chancellor to observe that the circumstances that led him to conclude that the dividend should be ordered remained unchanged at the time he entered his decree. The shape of equitable relief is not of necessity controlled by the prayer; it is fashioned by the chancellor according to the conditions and equities existing at the time the decree is made. *Carlson v Williams,* 348 Mich 165, 168; 82 NW2d 483 (1957), *Herpolsheimer v A B Herpolsheimer Realty Co,* 344 Mich 657, 665; 75 NW2d 333 (1956), see 27 Am Jur 2d, Equity, § 249, p 818.

In *Patton v Nicholas,* 279 SW2d 848 (Tex, 1955), the trial court found that defendant had maliciously suppressed dividends and ordered liquidation of the corporation. On appeal the Court reversed the order for liquidation, holding instead that plaintiffs were entitled to an injunction order-

ing payment of a substantial dividend and the payment of reasonable dividends annually thereafter, consistent with good business practice. The Court ordered the trial court to retain continuing jurisdiction of the cause for a reasonable period, not to exceed five years.

In the instant case the chancellor's stated reasons for retaining jurisdiction were to afford "full relief", using "the most expeditious and expedient procedure", so as "to permit in *this* action what the Plaintiffs would have a right to do, in any event, in another action", and thereby avoid the need for relitigation of the same facts in an independent action "to reestablish that what [sic] has already been tried". Plaintiffs' supplemental complaint for dividends requests relief identical to that sought in their original complaint, and thus the relief sought is within the scope of the original bill. *Carlson v Williams, supra,* at 168. Moreover, unlike the sweeping decree in *Patton v Nicholas, supra,* which provided for ongoing supervision of corporate affairs, the chancellor did not order future dividends nor undertake to interfere with the management of corporate affairs, but instead merely retained jurisdiction to determine whether additional dividends should be awarded in the event that defendants continued wrongfully to withhold them. Under the circumstances of this case we conclude that the chancellor did not abuse his discretion in retaining jurisdiction. See 2 O'Neal, *supra,* at § 8.08, p 61.

## V

Plaintiffs contend that the chancellor erred in denying them reimbursement for their attorney's fees and expenses, relying upon *Sant v Perronville Shingle Co,* 179 Mich 42, 59; 146 NW 212 (1914).

This case is distinguishable from *Sant* because plaintiffs have not brought funds into the corporate treasury; rather, funds are going out. Moreover, plaintiffs' interests were adverse to those of all other shareholders, unlike the situation in *Starring v Kemp,* 167 Va 429, 436–437; 118 SE 174, 177–178 (1936), and therefore, there can be no allowance of counsel fees. 20 Am Jur 2d, Costs, § 86, p 72. There was no abuse.

The decree is affirmed. No costs, neither party having prevailed in full.